[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15690

_____

D.C. Docket No. 1:15-cr-20838-UU-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PAUL JOHNSON, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 16, 2019)

Before ED CARNES, Chief Judge, TJOFLAT, MARCUS, WILSON, WILLIAM
PRYOR, MARTIN, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM,
BRANCH, and GRANT, Circuit Judges.

WILLIAM PRYOR, Circuit Judge, delivered the opinion of the Court, in which
ED CARNES, Chief Judge, TJOFLAT, MARCUS, NEWSOM, BRANCH, and
GRANT, Circuit Judges, joined.

NEWSOM, Circuit Judge, filed a concurring opinion.

BRANCH, Circuit Judge, filed a concurring opinion, in which GRANT, Circuit Judge, joined.

JORDAN, Circuit Judge, filed a dissenting opinion.

ROSENBAUM, Circuit Judge, filed a dissenting opinion.

JILL PRYOR, Circuit Judge, filed a dissenting opinion, in which WILSON, MARTIN, and JORDAN, Circuit Judges, joined.

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide whether a police officer violated the Fourth Amendment when he removed a round of live ammunition and a holster from the pocket of a suspect during a protective frisk, *see Terry v. Ohio*, 392 U.S. 1 (1968). At 4:00 a.m., the officer responded to a call about a burglary in progress in a high-crime area. When the officer arrived at the scene, he saw Paul Johnson, who matched the burglar's description, standing in a dark alley. After detaining Johnson, the officer frisked him and immediately recognized that he had a round of ammunition in his pocket. The officer removed the ammunition and an empty holster covering it. He then canvassed the area and found two pistols less than a foot from where he first saw Johnson. After a grand jury indicted Johnson for being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), he moved to suppress the pistols, ammunition, and holster, but the district court denied his motion. A panel of this Court reversed. *United States v. Johnson*, 885 F.3d 1313 (11th Cir.), *reh'g en banc granted, op. vacated*, 892 F.3d

2

1155 (11th Cir. 2018). We then vacated that decision and ordered rehearing en banc. We now affirm the denial of Johnson's motion to suppress because the officer was entitled to seize the ammunition to protect himself and others.

## I. BACKGROUND

We review the facts adduced at the evidentiary hearings because they are critical to our resolution of this case. Dwight Williams, a police officer for the City of Opa-Locka, Florida, sat alone in his patrol car when a call came over his radio shortly after 4:00 a.m. on June 14, 2015. The call reported a burglary in progress at a nearby multi-family duplex and described the burglar as a black male wearing a white shirt. Officer Williams and another officer responded to the call. Officer Williams knew from experience that responding to a burglary can be dangerous because burglars are often armed.

The officers arrived at the duplex and started to search for the suspected burglar. Officer Williams saw Paul Johnson, a black male wearing a white shirt standing near a fence in a dark alley at the back of the duplex. The officers asked Johnson to come toward them where they could "see him a little better." Johnson complied, and as he walked toward them, another officer arrived on the scene. The officers ordered Johnson to lie on the ground and handcuffed him. Officer Williams then began frisking Johnson.

While patting down Johnson's pocket, Officer Williams felt something nylon covering "a small, round, hard object" that he immediately recognized as ammunition. He reached into Johnson's pocket and removed the round of ammunition and an empty nylon holster. The round belonged to a .380 caliber gun. Officer Williams was concerned; as he later testified, "the round that was in [Johnson's] pocket and the holster led [him] to believe that there [wa]s a weapon that [the] round goes to and something goes into that holster." Based on his experience that burglaries often involve more than one perpetrator, he was also concerned that there was "another person in an apartment [who] m[ight] come out with something."

As Officer Williams searched the area for a gun, Johnson told the other officers that he had been trying to wake up his girlfriend, who lived at the duplex, by knocking loudly on her door. Johnson suggested that someone might have thought he was trying to break in. The officers tried to confirm Johnson's story, but his girlfriend would not answer their knock at her door.

Meanwhile, Officer Williams found a hole in the fence close to where Johnson had been standing. Knowing that suspects "throw[]" away weapons "a lot in Opa-Locka" when they encounter the police, Officer Williams drove around the fence to see if a gun had been tossed on the other side. Sure enough, he found two pistols, one .380 caliber and the other .40 caliber, less than a foot from where the

4

officers had first seen Johnson. Officer Williams checked the serial numbers on the pistols and determined that both had been reported as stolen.

Johnson's girlfriend eventually opened her door for the officers. She confirmed that Johnson lived at the duplex with her and that he was trying to enter their home. The officers then arrested Johnson.

The officers took Johnson to the police station, where he waived his rights to remain silent and to counsel, *see Miranda v. Arizona*, 384 U.S. 436 (1966). Johnson confessed that he was holding the pistols for his brother and cousin, even though he had previously been convicted of a felony. A grand jury later indicted Johnson for being a felon in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(1).

Johnson moved to suppress the ammunition, the holster, and the pistols, along with any statements resulting from the frisk. Johnson argued that Officer Williams violated the Fourth Amendment by frisking him and by seizing the ammunition and holster. A magistrate judge held two evidentiary hearings on the motion.

The officers who detained Johnson testified that Opa-Locka is a "high-crime area" that receives a "high volume of calls" involving "bodily harm done to others" and the use of firearms "in [multiple] aspects of the crimes from burglaries to robberies to home invasions." The officers testified that, in their experience,

5

burglaries in Opa-Locka often involve more than one perpetrator. According to Officer Williams, a reported burglary presents a dangerous situation for the officers because, "when [the officers] arrive to the scene, [they] never know where the potential [suspect] may be, . . . never know what [a suspect] has, [and] never know if [they] have any lighting to see the potential [suspect]." Officer Williams testified that the officers detained Johnson "because of the nature of the call and the current conditions" at the scene and to "make sure that no one else was on the premise with him." After the hearings, the magistrate judge issued a report and recommendation concluding that Officer Williams did not violate the Fourth Amendment by frisking Johnson and removing the ammunition and holster from his pocket.

The district court adopted the magistrate judge's report and recommendation and denied Johnson's motion to suppress. The district court ruled that the frisk was constitutional at its inception because "Officer Williams had reasonable suspicion to believe that his safety or the safety of others was in danger." And it ruled that the removal of the ammunition and holster "was a justified continuation of the initial frisk." The district court reasoned that "[a]n officer's seizure of ammunition following a lawful frisk when investigating a possible violent crime, particularly when confronted with an unsecure scene, is sufficiently connected to officer safety

6

not to run afoul of the Fourth Amendment." Johnson pleaded guilty but reserved his right to appeal the denial of his motion to suppress.

A panel of this Court reversed. *Johnson*, 885 F.3d at 1324. The panel agreed that the frisk was constitutional at its inception because, "[c]onsidering the totality of the facts, . . . Officer Williams reasonably believed that his safety, or the safety of his fellow officers, was at risk." *Id.* at 1322. But the panel concluded that the removal of the ammunition and holster from Johnson's pocket violated the Fourth Amendment. *Id.* at 1322–24. It held "the presence of a single round of ammunition—without facts supporting the presence, or reasonable expectation of the presence, of a firearm—was insufficient to justify the seizure of the bullet and the holster." *Id.* at 1323–24.

We vacated the panel's opinion and ordered rehearing en banc. We instructed the parties to address one issue: whether Officer Williams was entitled, when he felt a round of ammunition in Johnson's pocket during a *Terry* frisk, to seize the ammunition and the holster.

## II. STANDARDS OF REVIEW

We review the denial of a motion to suppress under a mixed standard of review. *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007). We review the district court's findings of fact for clear error and review the application of law to the facts *de novo*. *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015).

7

We view the evidence in the light most favorable to the government, as "the party that prevailed in the district court." *Id.* (citation and quotation marks omitted).

### III. DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "[R]easonableness is always the touchstone of Fourth Amendment analysis," *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2186 (2016), because "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures," *Terry*, 392 U.S. at 9 (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)).

When an officer reasonably believes that a suspect threatens his safety or the safety of others, he may search the suspect and seize concealed objects that he reasonably believes may be weapons or other instruments of assault. *See Terry*, 392 U.S. at 27, 29. To frisk a suspect, an officer "conduct[s] a carefully limited search of the outer clothing of [the suspect] . . . to discover weapons which might be used to assault him." *Id.* at 30. And if an officer "feels a concealed object that he reasonably believes may be a weapon," he may continue the search beyond the outer clothing "by searching [the suspect's] pocket" and removing the concealed object. *Clay*, 483 F.3d at 743–44.

8

"The sole justification of the search [of a suspect] is the protection of the police officer and others nearby," *Terry*, 392 U.S. at 29, so a frisk must remain "reasonably related in scope to the circumstances which justified the [frisk] in the first place," *id.* at 20. A frisk "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer" does not exceed its permissible scope. *Id.* at 29.

When we consider "the limitations which the Fourth Amendment places upon a protective seizure and search for weapons[,] . . . [we consider] the concrete factual circumstances of [the] individual case[]." *Id.* We ask "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27. In this inquiry, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "[This] process does not deal with hard certainties, but with probabilities." *Id.* at 418. Circumstances that we consider include the time of day, the location of the scene, the lighting at the scene, the number of officers, and the nature of the alleged crime. *See United States v. Griffin*, 696 F.3d 1354, 1359–60 (11th Cir. 2012); *see, e.g.*, *United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir. 1987) ("The hour was late, the street was dark, the officer was alone, and the suspected crime was a burglary, a felony that often involves the use of weapons."). We must assess the totality of the

9

circumstances, "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418.

Consider the "concrete factual circumstances" that Officer Williams encountered. When Officer Williams received the call about a burglary in progress at 4:00 a.m., he was patrolling a "high-crime area" that receives a "high volume of calls" involving "bodily harm done to others" by guns. At the scene, Officer Williams saw Johnson, who matched the burglar's description, standing in a dark alley. And the scene was not yet secure. *See Griffin*, 696 F.3d at 1359 (taking into account that an officer "had not finished investigating the alleged attempted theft"). Officer Williams knew both that burglars in Opa-Locka were often armed and that they often worked with other perpetrators. When Officer Williams immediately recognized the ammunition in Johnson's pocket during the frisk, he "neutralize[d] the threat of physical harm" by removing the ammunition from Johnson's pocket. *Terry*, 392 U.S. at 24.

As an essential part of a lethal weapon, Johnson's ammunition threatened the safety of Officer Williams and others in this circumstance. Although Johnson argues that his ammunition, by itself, posed no danger to the safety of Officer Williams or others, his argument fails to appreciate the grave injury that could have been caused by his ammunition if it had been loaded into a gun. Johnson compares ammunition to "a pebble, marble, coin, gemstone, ball bearing, or rock

10

of crack cocaine." But even Johnson acknowledges a crucial difference between those other objects and a round of live ammunition: the round of ammunition is designed to become a deadly projectile. Ammunition is not a gun, but it is an integral part of what makes a gun lethal.

Examining Johnson's ammunition also could have assisted Officer Williams's search for a .380 caliber gun that he had good reason to believe was in the vicinity of the unsecure scene of a reported burglary in a high-crime area late at night. When Officer Williams discovered ammunition in Johnson's pocket, he had reason to believe a gun was in the vicinity because "[c]ommon sense and logic dictate that a bullet is often associated with a gun." *People v. Colyar*, 996 N.E.2d 575, 585 (Ill. 2013). And Officer Williams's removal of the ammunition could have informed him of what caliber or type of gun might be nearby. True, he could not use the frisk to gather evidence because a frisk must remain "[]related to the sole justification of the search under *Terry*: the protection of the police officer and others nearby." *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (alterations adopted) (citation and quotation marks omitted). But seizing the ammunition in Johnson's pocket did not "amount[] to the sort of evidentiary search that *Terry* expressly refused to authorize"; in this circumstance, it instead amounted to the sort of protective search that *Terry* permits because Officer Williams had to find any gun to secure the scene and protect himself and others. *Id.* We reject Judge Jill

11

Pryor's suggestion that a safety measure within the scope of *Terry*'s rationale becomes a "'condemned' evidentiary search[]" whenever it *also* provides the officers with new information. Jill Pryor Dissenting Op. at 87 (quoting *Dickerson*, 508 U.S. at 378).

That an officer may seize ammunition when it threatens the safety of officers and others has long been the settled precedent in several jurisdictions. For example, in *United States v. Ward*, the Eighth Circuit ruled that an officer who believed that cylindrical objects in a suspect's pocket were shotgun shells "was justified in reaching into the pocket to retrieve them." 23 F.3d 1303, 1306 (8th Cir. 1994). In *Scott v. State*, the Supreme Court of Nevada ruled that, after seizing a gun, an officer may remove ammunition from a suspect's pocket because "[i]t is reasonable for an officer, as a precautionary measure, to retrieve and separate from a suspect during the course of a *Terry* stop and frisk, either weapons or ammunition or both." 877 P.2d 503, 509 (Nev. 1994). In *State v. Smith*, the Supreme Court of Arizona held that an officer reasonably seized "the contents of Smith's pockets which were bulging with shotgun ammunition." 665 P.2d 995, 998 (Ariz. 1983) (en banc). And in *Colyar*, the Supreme Court of Illinois ruled that an officer who saw ammunition in a car "could reasonably suspect the presence of a gun, thus implicating officer safety," and could seize the ammunition. 996 N.E.2d at 585, 587. *See also State v. Moton*, 733 S.W.2d 449, 451 (Mo. Ct. App. 1986)

12

(holding that officer's seizure of 13 rounds of ammunition during a frisk was lawful); *People v. Lewis*, 507 N.Y.S.2d 80, 81 (N.Y. App. Div. 1986) (holding that officer responding to a call about armed robbery was entitled to seize ammunition and a gun from a suspect who was driving a car that matched the description of the robber's car). Indeed, we are aware of no precedential opinion to the contrary in any jurisdiction.

Judge Jill Pryor suggests that "a couple of" federal-court decisions "cut against" our holding, Jill Pryor Dissenting Op. at 82, but we are not persuaded. In *United States v. Miles*, the Ninth Circuit held that an officer exceeded *Terry*'s limits by shaking a small box of bullets in a suspect's pocket because the contents of the box were not immediately apparent to the officer. 247 F.3d 1009, 1015 (9th Cir. 2001). By contrast, Officer Williams testified that, when he felt the object in Johnson's pocket, he "immediately thought it was ammunition." And in *United States v. Lemons*, the Eastern District of Wisconsin ruled that "ammunition alone cannot be considered contraband"—an issue not presented by this appeal. 153 F. Supp. 2d 948, 960 (E.D. Wis. 2001); *see also id.* at 957 (finding that the officer who conducted the frisk "did not immediately recognize the items as bullets"). Apart from describing ammunition as a "nonweapon[]," the district court did not consider whether or in what circumstances an officer might be justified in seizing it as a safety measure. *Id.* at 959. Nor can we overlook that the opinion of a district

13

court is not precedential. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent . . . ." (citation and internal quotation marks omitted)); *accord* Bryan A. Garner et al., *The Law of Judicial Precedent* § 29, at 255 (2016).

Johnson argues that, because the scope of a frisk is limited to a search for weapons and ammunition is not a weapon, Officer Williams was not entitled to remove the ammunition from his pocket. But Johnson reads *Terry* as if the central question it posed were whether a given object qualifies as a "weapon" in the abstract and not whether removing and securing the object is reasonably related to "the protection of the police officer and others nearby," 392 U.S. at 29. In *Terry*, the Supreme Court contemplated that an officer could, of course, remove "guns, knives, [and] clubs," but it never limited a frisk to those specified weapons. *Id.* Instead of creating a laundry list of particular objects that an officer may remove during a frisk, the Supreme Court explained that "[t]hese limitations will have to be developed in the concrete factual circumstances of individual cases." *Id.* And when applying *Terry* in individual cases, we have ruled that officers are entitled to seize a variety of items that are not traditional weapons. *See, e.g.*, *Clay*, 483 F.3d at 743 (holding that an officer lawfully seized a "long, thin object," which turned out to be the empty barrel of a ballpoint pen, because he thought it "might be a screwdriver or something similar that could be used as a weapon"). After all, *Terry*

14

explained that an officer can also remove "other hidden instruments for the assault of the police officer." 392 U.S. at 29; *see also Sibron v. New York*, 392 U.S. 40, 65 (1968) (*Terry*'s companion case also ruling that an officer may remove "concealed objects which might be used as instruments of assault").

In considering a frisk's proper scope, we cannot isolate *Terry*'s references to "weapons" from the "sole justification" for the frisk: "the protection of the police officer and others nearby." 392 U.S. at 29. To be sure, the scope of a frisk must be "carefully limited" to serve that justification, *id.* at 30, but it must not be so limited that officers cannot take reasonable actions in furtherance of their own safety and that of others. As the *Terry* Court made clear, we cannot "deny the officer the power to take necessary measures . . . to neutralize the threat of physical harm." *Id.* at 24. In short, during a *Terry* frisk, an officer may remove ammunition from a suspect when the removal is reasonably related to the protection of the officers and others nearby. *See id.* at 19–20.

Johnson argues that "the way to defuse the potential danger [posed by ammunition] is to locate and seize the firearm that might be present," but we cannot, with hindsight, dictate best practices for police officers. "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985). Instead of

15

imagining other ways to defuse the danger posed by ammunition, we assess only whether an officer acted reasonably in his circumstance. *See id.*

Officer Williams acted reasonably when he seized the ammunition and holster in Johnson's pocket. He was entitled to "tak[e] steps to assure" himself that the ammunition in Johnson's pocket would not be loaded into "a weapon that could . . . fatally be used against [him]." *Maryland v. Buie*, 494 U.S. 325, 333 (1990) (discussing the protection concerns that animate a *Terry* frisk). When Officer Williams seized the ammunition and empty holster, he had every reason to expect that a matching gun was nearby. Officer Williams even testified that the ammunition in Johnson's pocket "led [him] to believe that there [wa]s a weapon that [the] round goes to and something goes into that holster." And he explained that suspects "throw[]" away weapons "a lot in Opa-Locka" when they encounter the police. When Officer Williams found only a single round of ammunition in Johnson's pocket, he was left to fear where other ammunition may be, especially a round already loaded into a gun's chamber.

That Johnson was handcuffed when he was frisked did not eliminate the danger posed by the ammunition. The Supreme Court has rejected as "mistaken" the argument that officers cannot reasonably fear for their safety when a suspect "was effectively under [the officers'] control during the investigative stop and could not get access to any weapons that might have been located [nearby]."

16

*Michigan v. Long*, 463 U.S. 1032, 1051 (1983). Handcuffs do not always work, and suspects have been known to reach for weapons even when handcuffed. *See United States v. Sanders*, 994 F.2d 200, 209–10 (5th Cir. 1993) (rejecting the argument "that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will . . . do them harm").

When Johnson was stopped and frisked, the officers had not found a gun on the scene, did not know how many or what kind of guns might be on the scene, and did not know whether others, who were not handcuffed, participated in the burglary and were still lurking in the area. But the officers did know, based on their experience, that burglaries in Opa-Locka often involve guns and often involve more than one person. "In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves . . . ." *Terry*, 392 U.S. at 24.

Although Johnson argues that *Terry* is inconsistent with the original meaning of the Fourth Amendment and that we should apply it narrowly to "limit[] the damage," we must apply Supreme Court precedent neither narrowly nor liberally—only faithfully. Johnson appeals to Justice Scalia's expressed doubts about *Terry*, *see Dickerson*, 508 U.S. at 382 (Scalia, J., concurring) (opining that *Terry* did not discuss "the original state of the law" and instead represents "the original-meaning-is-irrelevant, good-policy-is-constitutional-law school of

17

jurisprudence"), though Justice Scalia also recognized that a frisk might have been "considered permissible" when the Fourteenth Amendment was adopted or might otherwise be considered "reasonable" now, *id.* But when "a precedent of [the Supreme] Court has direct application," we must follow it. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

To be sure, in several areas, the Supreme Court has considered the original meaning of the Fourth Amendment. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (original understanding of an officer's authority to arrest a suspect); *United States v. Ramsey*, 431 U.S. 606, 616 (1977) (original understanding of border searches). And we have followed its approach in those areas. *See, e.g.*, *United States v. Touset*, 890 F.3d 1227, 1232 (11th Cir. 2018) (quoting *Ramsey*, 431 U.S. at 616–17); *United States v. Phillips*, 834 F.3d 1176, 1179–80 (11th Cir. 2016) (quoting *Moore*, 553 U.S. at 168). We also have determined the original meaning of other constitutional provisions to resolve questions of first impression. *See, e.g.*, *United States v. Campbell*, 743 F.3d 802, 810–11 (11th Cir. 2014) (original understanding of "Felonies committed on the high Seas"); *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1249–51, 1254 (11th Cir. 2012) (original understanding of "Offences against the Law of Nations"). But *Terry*—the precedent that directly controls—explained that we must consider the need to

18

protect officer safety when evaluating the scope of a frisk without mention of original meaning. *See Terry*, 392 U.S. at 29.

We cannot use originalism as a makeweight when applying that analytic framework. Nor can we promise that Johnson would like the result if we *did* have the authority to approximate originalist outcomes by selectively trimming binding precedent around the edges. *See, e.g.*, *Collins v. Virginia*, 138 S. Ct. 1663, 1676–77 (2018) (Thomas, J., concurring) (explaining that the law during the Founding period did not exclude illegally seized evidence and indeed "sometimes reflected the inverse of the exclusionary rule" because "that someone turned out to be guilty could *justify* an illegal seizure") (citing *Gelston v. Hoyt*, 3 Wheat. 246, 310 (1818) (Story, J.); 2 William Hawkins, *A Treatise of the Pleas of the Crown* 77 (1721)); *see also Janus v. AFSCME*, 138 S. Ct. 2448, 2470 (2018) (rejecting the "halfway originalism" of parties who appeal to the original meaning "only when it suits them"). And we cannot use a halfway theory of judicial precedent to cut back on *Terry* while faithfully adhering to the exclusionary rule. As an "inferior" court, U.S. Const. Art. III, § 1, we have no such authority: "The *only* Court that can properly cut back on Supreme Court decisions is the Supreme Court itself." *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 966 (11th Cir. 2018) (emphasis added).

19

Judges Rosenbaum and Jill Pryor, in dissent, level an attack against an opinion that we have not issued. According to Judge Rosenbaum's dissent, "we hold that any ammunition may *always* be seized during a frisk," Rosenbaum Dissenting Op. at 46 (emphasis added), and so transform the totality-of-the-circumstances test into a "brand new rule," *id.* at 68. *See also* Jill Pryor Dissenting Op. at 84–86. But we cannot decide whether Officer Williams was entitled to seize an object for his protection without considering the nature of that object. By discussing facts about ammunition, we do not create a categorical rule that ammunition may always be seized. Indeed, our concurring colleagues understand that we have not done so and write separately to explain that they prefer that we *would* adopt such a categorical rule. Newsom Concurring Op. at 25; Branch Concurring Op. at 37. And contrary to Judge Rosenbaum's accusation, we create no alternative holding, "stealth" or otherwise. Rosenbaum Dissenting Op. at 60; *see* Garner et al., *The Law of Judicial Precedent* § 10, at 128–29 ("[I]t's improper for a later court to infer an alternative holding or rationale where none is sufficiently expressed in the precedent.").

Judge Rosenbaum also accuses us of circumventing the adversarial process by addressing an issue "that we did not ask the parties to address, that neither party briefed, and that the government expressly declined to adopt at oral argument," Rosenbaum Dissenting Op. at 46, but even a cursory review of the en banc issue,

20

briefs, and oral argument proves this assertion wrong. We asked the parties to address one issue: "When he felt a round of ammunition in Paul Johnson Jr.'s pocket during a *Terry* frisk, was Officer Dwight Williams entitled to seize the ammunition and a nylon holster from Johnson's pocket?" In his brief, Johnson argued that Officer Williams was not entitled to seize the ammunition from his pocket because "the bullet in this particular case posed no conceivable threat to officer safety." The government argued in its brief that "Officer Williams was justified in retrieving the bullet because a reasonable officer under the circumstances could conclude that the bullet [wa]s an instrument of assault that could pose a danger to himself and other[s]." After oral argument, we now answer that question in the affirmative. Notably, although she styles her opinion as a "dissent," Judge Rosenbaum refuses to answer the one question—she deems it "non-en banc worthy"—that a majority of this Court voted to decide en banc. Rosenbaum Dissenting Op. at 70. So, unlike Judge Rosenbaum, we answer the very question the parties briefed and argued—nothing more and nothing less.

"The language of a judicial decision must be interpreted with reference to the circumstances of the particular case and the question under consideration." Garner et al., *The Law of Judicial Precedent* § 6, at 80. "As binding authority, [a] judicial decision[] is inherently limited to the facts of the case then before the court and the questions presented to the court in the light of those facts." *New Port*

21

*Largo, Inc. v. Monroe Cty.*, 985 F.2d 1488, 1499 (11th Cir. 1993) (Edmondson, J.,

concurring in the judgment). As Chief Justice John Marshall explained long ago,

"[i]t is a maxim not to be disregarded, that general expressions, in every opinion,

are to be taken in connection with the case in which those expressions are used."

*Cohens v. Virginia*, 19 U.S. 264, 399 (1821); *see also Armour & Co. v. Wantock*,

323 U.S. 126, 133 (1944) ("[W]ords of our opinions are to be read in the light of

the facts of the case under discussion.").

To be sure, the reasoning of our decision generates a principle of law, the

application of which extends beyond the factual circumstances of this appeal. That

result does not arise from an abandonment of the fact-bound inquiry prescribed by

*Terry*, but instead reflects how a totality-of-the-circumstances test works when

reviewing a stop and frisk. Correctly understood, the output of a totality-of-the-

circumstances inquiry is *necessarily* a conditional legal principle: by deciding that

particular circumstances mandate a particular result, a court adopts a principle that

if materially similar circumstances obtain, the same result must follow. In other

words, there is no either-or choice between formulating an abstract principle of law

and applying a totality-of-the-circumstances test. Applying the latter yields the

former, which is all that we have done to resolve this appeal. We have adopted the

principle that if an officer conducts a lawful *Terry* stop and frisk in materially

22

similar circumstances, then that officer is entitled to seize ammunition from the suspect.

We have neither jettisoned *Terry*'s totality-of-the-circumstances approach in favor of a categorical rule nor resolved a question that we did not ask the parties to address. In resolving the question we posed, we necessarily adopt a principle with potential application to future cases. But the principle is not *universally* applicable because it is tethered to the concrete factual circumstances of Johnson's stop and frisk. And we cannot indulge our dissenting colleague's call for an explanation of how "courts will be able to reach any other conclusions in cases involving any ammunition, regardless of any other circumstances," Rosenbaum Dissenting Op. at 54, because "[w]e are not in the business of issuing advisory opinions . . . that merely opine on 'what the law would be upon a hypothetical state of facts.'" *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).

Officer Williams's frisk remained "reasonably related in scope to the circumstances which justified the [frisk] in the first place." *Terry*, 392 U.S. at 20. Officer Williams encountered an unsecure scene, late at night, in a high-crime area, while investigating a reported burglary. Officer Williams's removal of the ammunition and holster was reasonably related to the protection of the officers and others. We hold that Officer Williams did not violate Johnson's Fourth

Amendment rights by removing the ammunition and holster from his pocket during the frisk.

## IV. CONCLUSION

We **AFFIRM** Johnson's judgment of conviction and sentence.

NEWSOM, Circuit Judge, concurring:

I agree that, in the "circumstances" that he confronted, the Fourth Amendment permitted Officer Williams to seize the bullet that he felt in Johnson's pocket, *see* Majority Op. at 9–10, and I therefore join the Court's opinion.  I write separately to clarify that if it were up to me, rather than tying that judgment to the particular situation faced by the particular officer in this particular case, I would simply hold, as a prophylactic matter, that if a policeman discovers a bullet during the course of an otherwise-lawful *Terry* stop, he can seize it as a means of "neutraliz[ing] the threat" to himself and others.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

My concern with a fact-bound "totality-of-the-circumstances" approach is simply stated:  It can leave police officers guessing—and thus potentially hesitant, and thus potentially vulnerable.  The majority enumerates a variety of factors that it says justified Officer Williams's determination that seizing the bullet was appropriate here: (1) it was 4:00 a.m.; (2) he was patrolling a "high-crime area"; (3) he had answered a call about a potentially violent residential burglary; (4) he encountered Johnson "in a dark alley"; and (5) "the scene was not yet secure." Majority Op. at 10.  That all seems perfectly sensible to me.  And more than just sensible, given my understanding of *Terry* it also seems perfectly correct:  In the light of the particular situation that he faced—or the dark of it, as the case may

25

be—Officer Williams reasonably concluded that there was a sufficient threat to his (and others') safety to warrant confiscating the bullet.

In fairness, though, the dissent also has a totality-of-the-circumstances story to tell. It highlights the following "combination of facts" known to Officer Williams before he frisked Johnson: "(1) there had been no report or indication of a weapon or an accomplice at the scene; (2) at least two other armed officers had arrived at the scene; (3) Mr. Johnson had immediately, peacefully, and *at gunpoint* complied with the officers' commands; and (4) the officers had placed Mr. Johnson on the ground and handcuffed him." J. Pryor Dissenting Op. at 79–80 (footnote call omitted). Speaking for myself, I find the dissent's laundry list somewhat less compelling than the majority's—it seems clear to me, for instance, that a handcuffed suspect can still threaten officer safety, *see, e.g.*, *United States v. Sanders*, 994 F.2d 200, 209–10 (5th Cir. 1993)—but I certainly can't dismiss the dissent's assessment of the situation as ridiculous or groundless.

So even in this case—and even now, more than three years after the fact, from the cozy comfort of our respective judicial chambers—we're having a healthy, good-faith debate about whether the "totality of the circumstances" warranted Officer Williams's seizure of the bullet. And although I find that the balance tips in Officer Williams's—and thus the majority's—favor, there are, I must admit, decent arguments on both sides. What I worry about is the next

26

case—and the one after that, and the one after that—which will inevitably involve a different mix of variables. Let's take, for instance, "time of day," which the majority emphasizes—Officer Williams responded to the call here in the wee hours, around 4:00 a.m. Majority Op. at 9–10. What if, instead, he had encountered Johnson in broad daylight in the middle of the afternoon? Same result? How about "location of the scene"? *Id.* Opa-Locka is apparently a pretty tough neighborhood—a "high-crime area." *Id.* But what if we head 10 miles due south, straight down FL-953, to Coral Gables? (For our Alabama readers, think Mountain Brook or Vestavia Hills; for the Georgians, Milton or Sandy Springs.) Seizure still permissible? Now consider a few of the factors that the dissent brings to bear. By the time the bullet was seized, there were a total of three armed officers on the scene. *See* J. Pryor Dissenting Op. at 77–78. But what if an officer confronts a suspect alone? Still a Fourth Amendment violation? The dissent also stresses that Johnson was handcuffed—and thus essentially incapable of retrieving and deploying the stashed ammo. *Id.* Different result if the suspect isn't yet securely restrained at the time the officer feels the bullet?

You get my point. Even we judges—with the luxury of time for study and reflection—can't say for certain how we would crunch those factors in future cases. Where in the world does that leave responding officers? Policemen and women are tasked with the often-unenviable task of protecting the public safety,

27

and in so doing they must make split-second judgments about how best to secure a scene or situation. I would rather not require them to work their way through a multi-factor Fourth Amendment balancing analysis in order to determine whether the decision to confiscate a bullet—a bullet!—will stand up to after-the-fact judicial second-guessing. I would prefer—and I believe Supreme Court precedent supports—a clear rule authorizing the seizure. The Court "repeatedly has acknowledged," in all manner of cases, "the difficulties created for courts, police, and citizens by an ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances." *Oliver v. United States*, 466 U.S. 170, 181 (1984). Such totality-of-the-circumstances balancing, the Court has stressed, "not only makes it difficult for the policeman to discern the scope of his authority"—the thrust of my critique here—but "also creates a danger that constitutional rights will be arbitrarily and inequitably enforced." *Id*. at 181–82.[1]

---

[1] *Cf., e.g.*, *Georgia v. Randolph*, 547 U.S. 103, 121 (2006) ("This is the line we draw, and we think the formalism is justified."); *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001) ("Often enough, the Fourth Amendment has to be applied on the spur (and in the heat) of the moment, and the object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made."); *Dunaway v. New York*, 442 U.S. 200, 213–14 (1979) ("A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront."); *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search.").

Now I recognize, of course, that in *Terry* the Supreme Court excused itself from "develop[ing] at length" the Fourth Amendment rules that govern the sorts of searches at issue here, saying that they could instead be worked out in "the concrete factual circumstances of individual cases." 392 U.S. at 29. The Court, though, didn't leave *everything* in a state of totality-of-the-circumstances limbo. Instead, in the very same paragraph, the Court both clarified an overarching principle—namely, that protective searches must be justified by a concern for "the protection of the police officer and others nearby"—and then identified an illustrative list of items whose seizure would, as a *per se* matter, be deemed to serve that purpose: "guns, knives, clubs, [and] other hidden instruments for the assault of the police officer." *Id.* To be clear, *no one* thinks that when an officer conducting a *Terry* frisk identifies a "gun" he has to pause to brainstorm whether the particular circumstances in which he finds himself warrant a seizure; he can simply take it. Same for a "knife" or a "club"—take it. The question for me, therefore—since I'm the one advocating a clear rule to guide officer conduct—is whether a bullet fairly fits within *Terry*'s catch-all category, "other hidden instruments for the assault of the police officer." I think it does. An "instrument" is an "object, device, or apparatus designed or used for a particular purpose or task." *Oxford English Dictionary* (online ed.) Simply as a matter of plain language, it doesn't seem to me too far a stretch to conclude that a bullet qualifies

29

as an "object" that can be "used" to assault a police officer.  And that seems to me all the more true given *Terry*'s unmistakable focus on officer safety.

So in the next "bullet case," rather than asking—or worse, requiring the responding officer to ask—whether the neighborhood is sufficiently scary, the hour sufficiently late, the light sufficiently dim, and the suspect and scene sufficiently secure, I would simply hold that the Fourth Amendment permits the protective seizure.

BRANCH, Circuit Judge, joined by GRANT, Circuit Judge, concurring:

I join the majority opinion in full. The Fourth Amendment certainly authorized Officer Williams to seize the ammunition from Paul Johnson, Jr.'s pocket. I agree with Judge Newsom's concurrence insofar as it recognizes that a bullet falls within the list of items that *Terry* authorized an officer to seize during a lawful frisk—"guns, knives, clubs, [and] other hidden instruments for the assault of the police officer." *Terry v. Ohio*, 392 U.S. 1, 29 (1968). I write separately to clarify two points: (1) the totality of the circumstances analysis in *Terry* applies only when the officer is determining whether (a) to stop and (b) then to frisk the detained person; and (2) if the officer conducting the frisk complies with the scope of the search permitted by *Terry* and feels what the officer reasonably believes is a bullet, the officer may in all circumstances seize it.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment prohibits only unreasonable searches and seizures. *Terry*, 392 U.S. at 9 (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)). An officer may stop an individual for questioning upon reasonable suspicion that criminal activity "may be afoot." *Id.* at 30. The reasonable suspicion inquiry which justifies a *Terry* stop must be assessed by taking into account "the totality of the circumstances—the whole picture."

31

*United States v. Cortez*, 449 U.S. 411, 417 (1981).  Once an officer makes a *Terry* stop, if the officer also believes, based on the surrounding circumstances, that the individual "is armed and presently dangerous to the officer or to others," the officer may conduct a search of the suspect's outer clothing "to discover weapons which might be used to assault him," *Terry*, 392 U.S. at 30.

The search must be limited in scope based on the sole justification of the search—the protection of the police officer and others nearby—and therefore, must be "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29.  If, during the pat down, the officer "feels a concealed object that he reasonably believes may be a weapon," he may extend the search by reaching into the suspect's pocket and removing the object.  *United States v. Clay*, 483 F.3d 739, 743–44 (11th Cir. 2007).

The initiation of the stop and the initiation of the pat down are the only two points in the encounter at which the officer's reasonable belief must be assessed based on the totality of the circumstances.  *See State v. Smith*, 665 P.2d 995, 998 (Ariz. 1983) (finding that an officer was justified in conducting a pat down based on the "circumstances," and that "the police reasonably decided to inspect [and seize] the contents of [the suspect's] pockets which were bulging with shotgun ammunition").  Once the officer is authorized to conduct the pat down, the only questions are whether the limited scope of the pat down is proper under *Terry* and

32

whether, during the lawful pat down, the officer "feels a concealed object that he reasonably believes may be a weapon," *Clay*, 483 F.3d at 743. *See United States v. Rochin*, 662 F.3d 1272, 1273 (10th Cir. 2011) ("the [Fourth] Amendment's ever-present reasonableness requirement places strict limits on the scope or nature of the frisk an officer may administer"). If he does not reasonably believe the object is a weapon, he is not entitled to extend the search beyond the pat down of the suspect's outer clothing, for instance, by reaching into a pocket. *Sibron v. New York*, 392 U.S. 40, 65 (1968) (holding that an officer who reached into a pocket and found narcotics without first detecting a weapon exceeded the bounds of a lawful *Terry* search). If he does reasonably believe the object is a weapon, he is entitled to extend the search by "reach[ing] for and remov[ing]" the weapon. *Terry*, 392 U.S. at 29–30.

Determining whether the object the officer feels is a weapon does not depend on the totality of the circumstances but on whether the officer reasonably concludes based on feel that the object is a weapon. *See Minnesota v. Dickerson*, 508 U.S. 366, 376 (1993) (explaining that "[t]he very premise of *Terry* . . . is that officers will be able to detect the presence of weapons through the sense of touch"). Provided that the officer was justified in stopping the suspect and conducting a pat down and provided that the pat down did not exceed the "scope of a protected frisk," the "one question" is "did [the officer] act unreasonably when

33

he removed" the object. *United States v. Holmes*, 385 F.3d 786, 789–91 (D.C. Cir. 2004) (concluding that an officer acted reasonably in removing a "hard, square object" from the suspect's jacket pocket that turned out to be a scale).

In the *Terry* frisk context, a bullet is an "instrument[] for the assault of the police officer," *Terry*, 392 U.S. at 29, that an officer may reasonably remove pursuant to a pat down. As Judge Newsom points out, no one would question that an officer conducting a *Terry* frisk may always remove a gun he discovers during the search—regardless of the surrounding circumstances. *See id.* at 29–30; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977) (concluding that an officer who observed a bulge in a suspect's jacket was authorized to conduct a *Terry* pat down and seize the gun); *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010) (affirming the denial of a motion to suppress a gun found during a *Terry* frisk pursuant to an authorized *Terry* stop and frisk). The same reasoning applies to a bullet. Guns and bullets are of a piece; they go together. And one is no use without the other. In a *Terry* frisk context, a bullet poses substantially the same risk that a gun does—that it will be used as part of a dangerous combination to assault the officer. An officer seizing a gun does not know whether that gun is loaded, yet no one would dispute that the seizure of a gun is lawful even if it turns

34

out that the gun is unloaded.[1]  Similarly, an officer seizing a bullet may not know in a particular instance whether there is a gun nearby or if he missed a gun in the frisk.  Of course he would know that the bullet is not presently in a gun and must first be loaded into a gun but the risk remains largely the same.  Therefore, an officer conducting a *Terry* frisk that is authorized by a reasonable belief that the suspect is armed is entitled to seize a bullet to the same extent he is entitled to seize a gun—regardless of the surrounding circumstances.  It does not matter whether the frisk occurs in daylight hours or at night; nor does it matter if it occurs in high crime area or a relatively safe area of town.  If an officer discovers a bullet during a frisk lawful under *Terry*, the officer is entitled to seize the bullet as it is an instrument of assault in all circumstances.

One of the reasons we do not look to the surrounding circumstances in cases concerning the weapons listed in *Terry* is that, aside from removing the object, no precaution can eliminate the danger.  For instance, the Supreme Court has rejected the argument that a suspect who is effectively under the control of the officers cannot gain access to weapons located nearby.  *Michigan v. Long*, 463 U.S. 1032, 1051 (1983); *see also United States v. Sanders*, 994 F.2d 200, 209–10 (5th Cir. 1993) (rejecting the argument that "by handcuffing a suspect, the police instantly

---

[1] An unloaded gun, unlike most rounds of ammunition in civilian use, can nonetheless be used as a weapon (i.e., a club) but certainly an officer seizing a gun is primarily doing so because its intended purpose presents the gravest threat to the officer.

35

and completely eliminate all risks that the suspect will . . . do them harm."). Further, even the presence of multiple officers does not eliminate, though it may reduce, the risk that a suspect will obtain a gun and fire it at the officer.

Moreover, a bullet is an instrument of assault because its only purpose is to be used with a firearm. Like a gun, a bullet located during a *Terry* frisk poses an inherent risk to the safety of the officer and others nearby, and the police officer should not be required to assume such "unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23. For those reasons, having found a bullet pursuant to a *Terry* frisk, an officer is permitted to seize it in the same manner as he would a gun.

This is not to say that the Fourth Amendment provides no protection against the unreasonable seizure of a bullet. But those protections come at the initiation of the encounter when the officer must have reasonable suspicion of criminal activity in order to initiate the stop and a reasonable belief that the individual is armed and presently dangerous in order to conduct the pat down. *Id.* at 24, 30. It is also not to say that the totality of the circumstances has no role in the *Terry* context, of course it does, but that role is limited to the initiation of the stop and frisk. After having made those determinations, an officer is authorized to remove a concealed object that he reasonably believes is a weapon or other instrument of assault based on the pat down. And because a bullet is an instrument of assault in the *Terry*

36

context, it is reasonable under all circumstances for the officer to protect his safety and that of others nearby by removing the bullet.

Because I conclude that a bullet falls in to the category of "guns, knives, clubs, or other hidden instruments for the assault of the police officer," *id.* at 29, and cannot logically be separated from a gun for *Terry* purposes, I would find that anytime an officer conducts a lawful *Terry* frisk, the officer may seize any bullet located during the frisk.

JORDAN, Circuit Judge, dissenting.

This appeal presents an interesting case study for originalism, a set of related theories which (broadly speaking) call for constitutional provisions to be interpreted in accord with their understanding and meaning at the time of enactment or in accord with the intent of their framers.  *See, e.g., McDonald v. City of Chicago*, 561 U.S. 742, 813-38 (2010) (Thomas, J., concurring in part and concurring in the judgment); Randy Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L. Rev. 101, 105-08 (2001); Edwin Meese, III, Speech Before the American Bar Association on July 9, 1985, in Steven Calabresi, Originalism: A Quarter-Century of Debate 53-54 (2007); Antonin Scalia, A Matter of Interpretation 38 (1997); Robert H. Bork, The Tempting of America: The Political Seduction of the Law 144 (1990); Raoul Berger, Government by Judiciary: The Transformation of the Fourteenth Amendment 363-73 (1977).  I write separately to discuss the majority's failure to address, in any meaningful way, Mr. Johnson's originalist argument for limiting the reach of *Terry v. Ohio*, 392 U.S. 1 (1968).

\* \* \* \* \* \* \*

A quarter century ago, Justice Scalia concluded that the "frisk" aspect of *Terry*, 392 U.S. at 25-27—which allows the police to conduct pat-downs for weapons based only on reasonable suspicion—could not be justified on originalist grounds.  *See Minnesota v. Dickerson,* 508 U.S. 366, 381 (1993) (Scalia, J.,

concurring) (finding "no English authority" and "no clear support at common law" for physical searches of suspects absent probable cause).  Some subsequent scholarship appears to validate Justice Scalia's view.  *See, e.g.,* Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation 40-41 (2d ed. 2014) (asserting that in America and England during the period preceding the American Revolution, "[w]arrantless searches and seizures were virtually nonexistent or at least uncontroversial," and "[o]nly one type of warrantless seizure may have been common, that is, the arrest of a suspected felon"); Heather Winter, *Resurrecting the "Dead Hand" of the Common Law Rule of 1789: Why* Terry v. Ohio *is in Jeopardy*, 42 Crim. L. Bull. 564, 565 (2006) ("The historical evidence reveals that *Terry* frisks did not occur at common law and would have been viewed unfavorably by the Constitution's framers."); George C. Thomas III, *Time Travel, Hovercrafts, and the Framers: James Madison Sees the Future and Rewrites the Fourth Amendment*, 80 Notre Dame L. Rev. 1451, 1515 (2005) (concluding that *Terry*, insofar as it permits a warrantless frisk on the street without probable cause, "would have baffled the Framers").[1]

---

[1] Surveying Fourth Amendment law in the early 20th century, Justice Cardozo essentially came to the same conclusion while serving on the New York Court of Appeals: "Search of the person is unlawful when the seizure of the body is a trespass, and the purpose of the search is to discover grounds as yet unknown for arrest or accusation[.]  Search of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting the body of the accused to its physical dominion." *People v. Chiagles*, 237 N.Y. 193, 197, 142 N.E. 583 (1923) (citation omitted).

Relying on Justice Scalia's originalist position, Mr. Johnson argues that we should construe *Terry* narrowly, and not extend it to allow the seizure and removal of items that are neither weapons nor contraband. *See* Mr. Johnson's En Banc Br. at 18-23. But the majority barely acknowledges this argument, and declines to address its merits. According to the majority, we are bound by *Terry*, and must therefore ignore the original understanding of the Fourth Amendment.[2]

The majority is correct that *Terry* constitutes binding precedent, and that no one on this court can wish it away. But accepting *Terry* does not require extending its reach on an issue of first impression. *Terry* permitted pat-downs for weapons, and only weapons. *See Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979) ("Nothing in *Terry* can be understood to allow . . . any search whatever for anything but weapons."). By allowing officers to seize a stand-alone bullet from an unarmed suspect who is in handcuffs and being held at gunpoint by several officers, the majority expands *Terry* beyond its "narrow scope." *Dunaway v. New York*, 442 U.S. 200, 210 (1979).[3]

---

[2] The majority is not alone in refusing to address the merits of Mr. Johnson's originalist argument. The government has chosen to proceed as if the argument were never made. *See* Govt.'s En Banc Br. at 21-50. So have the concurring opinions.

[3] None of our sister circuits has expanded *Terry* this far. The majority cites *United States v. Ward*, 23 F.3d 1303 (8th Cir. 1994), for the proposition that "an officer may seize ammunition when it threatens the safety of officers." Maj. Op. at 12. But in *Ward*, unlike here, the pat-down uncovered a sawed-off shotgun in addition to ammunition. *See Ward*, 23 F.3d at 1304. The majority also cites cases from state courts for the same proposition, but in all of those cases there were facts showing or suggesting that the suspect was armed or had a firearm nearby. *See, e.g., Scott v. State*, 877 P.2d 503, 504-05 (Nev. 1994) (police seized 12-gauge shotgun shells from defendant who had

40

There are ways to deal with a precedent whose pedigree is questionable. If *Terry* rests on a shaky originalist foundation, something the majority does not dispute, there is always the option of declining to broaden it—of "refus[ing] to extend it one inch beyond its previous contours."  Richard Epstein, *The Classical Liberal Alternative to Progressive and Conservative Constitutionalism*, 77 U. Chi. L. Rev. 887, 903 (2010) (proposing a "proper" originalist response to the Supreme Court's New Deal jurisprudence).  *See also* Bork, The Tempting of America 158-59 (arguing that even where questionable precedential decisions "cannot be overruled . . . they can be confined to the subject areas they concern."); *Troxel v. Granville*, 530 U.S. 57, 92 (2000) (Scalia, J., dissenting) ("While I would not now overrule those [erroneous] earlier cases . . . neither would I extend the theory upon which they rested to this new context.").  Why not then stop where *Terry* and its progeny stop, and prohibit, absent probable cause, the seizure of items which are neither weapons nor contraband?

\* \* \* \* \* \* \*

The majority's decision to sidestep Mr. Johnson's originalist argument is particularly perplexing given the Supreme Court's instruction that "[i]n determining whether a search or seizure is unreasonable, we *begin* with history," and "look to the

---

been sitting in the rear seat of a vehicle which "contained firearms, including a loaded 12-gauge shotgun on the floor of the rear seat").  There are no such facts here.

41

statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve." *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (emphasis added). The majority appears to believe that *Terry* is an exception to this interpretive approach, and focuses instead on a pragmatic balancing of individual privacy and officer safety. *See* Maj. Op. at 18-19 (asserting that in the *Terry* context we "consider the need to protect officer safety" without regard to original meaning).[4]

But this suggestion—that we consider history in some Fourth Amendment cases, and not in others—is precisely the type of "halfway originalism" that the majority purports to reject. *See* Maj. Op. at 19 (quoting *Janus v. AFSCME*, 138 S. Ct. 2448, 2470 (2018)). And this approach is difficult to square with our consideration of history in analyzing the scope of various constitutional provisions (including the Fourth Amendment itself). *See, e.g., United States v. Gecas*, 120 F.3d 1419, 1435-57 (11th Cir. 1997) (en banc) (Fifth Amendment privilege against self-incrimination); *Evans v. Stephens*, 387 F.3d 1220, 1222-27 (11th Cir. 2004) (en banc) (President's power to "fill . . . Vacancies" under Art. II, § 2, cl. 3 of the Constitution); *United States v. Bellaizic-Hurtado*, 700 F.3d 1245, 1249-51, 1254

---

[4]The majority's framework leads to a question. If officer safety is the *raison d'être* of *Terry*, on what rationale does the majority uphold the seizure of the nylon holster from Mr. Johnson's pocket? We are not told. *Cf. United States v. Hirsch*, 493 F.2d 465, 466 (5th Cir. 1971) (suppressing firearm, holster *and* bullets seized during a 2:00 a.m. *Terry* frisk of a driver because, despite his "standing around nervously and giving confused explanations for his presence in the neighborhood," the officers were not in fear for their safety and had no basis to believe the driver was armed or dangerous).

(11th Cir. 2012) (Congress' authority to define "Offences against the Law of Nations" under Art. I, § 8, cl. 10 of the Constitution); *United States v. Touset*, 890 F.3d 1227, 1232 (11th Cir. 2018) (Fourth Amendment).

Defending its ahistorical approach, the majority warns Mr. Johnson that he might not "like the result" if history were front and center.  *See* Maj. Op. at 19.  It says that, under the original understanding of the Fourth Amendment, Mr. Johnson's motion to suppress would be doomed because courts would not be required to exclude unlawfully obtained evidence.  But this rhetorical challenge, though nicely put, is an empty one.  We are bound by directly controlling Supreme Court precedent to recognize and apply the exclusionary rule—whatever its originalist pedigree—in the context of *Terry* pat-downs.  *See, e.g., Terry*, 392 U.S. at 12; *Dickerson*, 508 U.S. at 372.  No similar precedent compels the expansion of *Terry* to permit the seizure of items that are neither weapons nor contraband under the circumstances present here.

The majority wants to make it seem that its holding results a priori from *Terry* and its progeny.  That is not so.  Under similar circumstances other federal courts have concluded that the seizure of ammunition from a suspect's clothing exceeded the scope of a *Terry* pat-down.  *See United States v. Miles*, 247 F.3d 1009, 1015 (9th Cir. 2001); *United States v. Lemons*, 153 F. Supp. 2d 948, 962 (E.D. Wisc. 2001).

43

The majority may not like these cases, but they are no less relevant than the authorities cited in its opinion.

\* \* \* \* \* \* \*

Originalism, we are told, is a preferable mode of constitutional interpretation because it provides "an objective basis for judgment that does not merely reflect the judge's own ideological stance." Michael W. McConnell, *Active Liberty: A Progressive Alternative to Textualism and Originalism?*, 119 Harv. L. Rev. 2387, 2415 (2006). *See also* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 863-64 (1989) ("[Originalism] establishes a historical criterion that is conceptually quite separate from the preferences of the judge himself."); Lillian R. BeVier, *The Integrity and Impersonality of Originalism*, 18 Harv. J.L. & Pub. Pol'y 283, 291 (1996) ("The criteria of originalism constrain all the participants in the game—including, most especially, the referees."). By choosing to avoid Mr. Johnson's originalist argument against the extension of *Terry* and its progeny, the majority gives credence to those who have noted that originalism, when applied selectively, can be just as subjective (and just as subject to manipulation) as other competing theories of constitutional interpretation:

> [H]ot-and-cold originalism grants the [judge] the discretion to decide when pragmatic considerations, whatever they may be, allow a departure from originalist orthodoxy. And . . . this discretion dilutes originalism's constraining power.

44

J. Harvie Wilkinson, III, Cosmic Constitutional Theory 56 (2012). *See also* Frank Cross, The Failed Promise of Originalism 188 (2013) ("[I]n realistic practice, all of the justices pick and choose when to use originalism, and none are faithful acolytes to the method.").

Some may view the majority's holding as properly balancing the interest that individuals have in privacy against the interest that officers have in safety. But the majority's balancing is of a 21st-century variety, without so much as a nod to history. Time will tell whether originalism, in one of its various forms, will continue to make ad hoc appearances in the opinions of this court.

45

ROSENBAUM, Circuit Judge, dissenting:

Today we hold that any ammunition may always be seized during a frisk when the searching officer immediately identifies it as ammunition, regardless of any surrounding circumstances. This is a new rule that we did not ask the parties to address, that neither party briefed, and that the government expressly declined to adopt at oral argument.

Indeed, during oral argument, the Court asked the government, "Once you feel the bullet, the officer can seize the bullet. Is that the government's position?" Recording of Oral Argument dated Oct. 24, 2018, at 38:58. And the government responded without equivocation, "No, Your Honor." *Id.* Then the government explicitly stated, "We are not asking the Court to rule that a bullet in isolation in all circumstances would be sufficient to reach in [to the pocket and seize]; we are asking the Court to apply the facts-specific Fourth Amendment tests that this Court has applied and other courts have applied . . . under the totality of the circumstances." *Id.* at 51:34.[1]

Because we operate only "as arbiters of legal questions presented and argued by the parties," *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 148 n.10

---

[1] *See also* Majority Op. at 21 (describing Johnson as having argued in his brief that "Officer Williams was not entitled to seize the ammunition from his pocket because 'the bullet *in this particular case* posed no conceivable threat to officer safety'" and the government as having argued in its brief that "'Officer Williams was justified in retrieving the bullet because a reasonable officer *under the circumstances* could conclude that the bullet [wa]s an instrument of assault that could pose a danger to himself and other[s].'") (emphasis added).

(2011) (citations and internal quotation marks omitted), once the government disclaimed the *per se* rule at oral argument, we were left with only two permissible options:  apply a true totality-of-the-circumstances test or rehear the case, ask the *per se* question to the parties and, if necessary, appointed counsel, and analyze the arguments presented.  Instead, the Majority Opinion takes a third route and adopts the new *per se* rule on its own.  That new rule may well be correct.  Or it may not. But if we wanted to consider such a rule, we should have asked the parties to brief and argue it in this en banc proceeding, instead of asking them to brief and argue a more discrete question.[2]

I organize my dissent from the Majority Opinion's decision to issue a rule on a question that was not before us, into three substantive parts.  In Section I, I show that, despite the Majority Opinion's insistence to the contrary, the Majority Opinion creates the new rule that ammunition is always seizable during a proper *Terry* frisk, without consideration of the surrounding circumstances.  In Section II, I recount the

---

[2] Judge Newsom's and Judge Branch's opinions openly acknowledge that they endorse this new *per se* rule.  Without opining on the substance of the Newsom and Branch Opinions, but from a judicial-procedure perspective only, I respectfully disagree that in these en banc proceedings, we should adopt the new *per se* rule they advocate.  Nevertheless, I don't take issue with suggesting new theories in non-majority opinions, as they can initiate thought and trigger development of the law in future cases.  I also applaud Judge Newsom's and Judge Branch's Opinions' transparency about their reasoning and consequences.    In contrast, the Majority Opinion declines to acknowledge that it adopts the same rule for which the Newsom and Branch Opinions advocate. But that does not mean that the Majority Opinion does not so hold.  As Section I of this dissent demonstrates, the Majority Opinion necessarily sanctions this new rule as much as the Newsom and Branch Opinions do.  And because this new rule will always require the conclusion that the seizure of ammunition was permissible in any given proper *Terry* frisk, regardless of the surrounding circumstances, that is the only holding that matters today.

47

many ways we could have avoided ruling on a question that was not before us, and I note the consequences of engaging in such a review. And in Section III, I explain that I do not opine on the question that actually was before us because the Majority Opinion's new rule makes that question moot.

## I.

This section demonstrates that today's Majority Opinion necessarily renders ammunition always seizable in a proper *Terry*[3] frisk. But before I get to that, I must acknowledge an awkward fact: the Majority Opinion insists that it has not established such a new rule. So of course, any reader likely and understandably will approach my dissent with some skepticism. In fact, my colleagues' views gave me serious pause—as they should have—that perhaps I had misread the Majority Opinion. So I have spent a lot of time closely reviewing and re-reviewing the Majority Opinion. But every reading has led me to the same conclusion: the Majority Opinion necessarily establishes the new rule that ammunition is always seizable in a *Terry* frisk. And district courts that must apply the lessons from the Majority Opinion will not logically be able to ever reach the conclusion that ammunition is not seizable in a permissible *Terry* frisk—no matter the circumstances.

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

48

One other note to keep in mind while considering the practical holding of today's Majority Opinion:  the Majority Opinion easily could have avoided creating its new rule today that all ammunition is always seizable in a *Terry* frisk.  All it would have had to do is include one additional sentence limiting the broad principles that otherwise necessarily flow from the Majority Opinion's reasoning.  But the Majority Opinion has refused to do so.  I hope readers will ask themselves why.  In the meantime, though, in Part A of this section, I describe the problematic aspects of the Majority Opinion and explain the easy fix that would prevent us from issuing our new rule today that ammunition is always seizable in a *Terry* frisk.  In Part B, I discuss the problems with a stealth holding like the one the Majority Opinion necessarily produces today.

## A.

The difficulties the Majority Opinion's reasoning creates begin at the second paragraph on page 10 of the Majority Opinion (beginning "As an essential part of a lethal weapon . . .") and continue through the top of page 12.  They arise because, in and of itself, the reasoning in question dictates today's holding that Johnson's bullet was properly seized—without reference to any actual circumstances existing at the time officers seized Johnson's bullet.  So that same reasoning that made Johnson's bullet seizable here necessarily requires the conclusion that ammunition is always seizable during a proper *Terry* frisk.  And under our prior-precedent rule, a holding

49

that sneaks into our jurisprudence through the back door of reasoning is every bit as binding as one that openly announces its presence as it enters through the front door. *Smith v. GTE Corp.*, 236 F.3d 1292, 1304 (11th Cir. 2001) ("The fact that the [prior panel of the Court] did not explicitly say 'there is no common and undivided interest in a class claim for punitive damages' does not undermine the clear reasoning and result of that decision nor does it vitiate the resulting rule."). So unfortunately, the Majority Opinion's refusal to expressly own its holding today that all ammunition is always seizable during a permissible *Terry* frisk does not render the holding any less binding.

In particular, to justify its determination that the ammunition here was seizable, the Majority Opinion reasons that when a bullet is present, so is a gun, "because common sense and logic dictate that a bullet is often associated with a gun" (the "bullet-means-gun" argument). Maj. Op. at 11 (citation, quotation marks, and alteration omitted). The Majority Opinion then goes on to opine that knowing the caliber of a bullet can be useful to determining the type of gun that might be present at the scene. *Id.* For this reason, the Majority Opinion concludes, the bullet was seizable since "Officer Williams had to find any gun to secure the scene and protect himself and others." *Id.* But there are two big problems with trying to glom this rationale onto the totality-of-the-circumstances test.

50

First, as the Majority Opinion implicitly concedes, this reasoning is based on hypothetical "facts." *See* Maj. Op. at 11 ("Officer Williams's removal of the ammunition *could have* informed him of what caliber or type of gun might be nearby.") (emphasis added). Despite testifying at two separate evidentiary hearings, neither Officer Williams nor any other law-enforcement officer ever said that he or she sought to use or that he or she did in fact consult the caliber of the seized bullet to ascertain what type of gun might be lying around.[4] So it is simply not accurate to

---

[4] Of course, it's impossible to cite a part of the testimony that proves that no officer testified that he or she actually consulted the caliber of the gun to assist in finding a weapon with a matching caliber. So instead, I quote the part of Officer Williams's testimony that comes closest. Yet even the most careful review of that testimony reveals that it still does not support the idea that Officer Williams actually consulted the caliber of the bullet and then used knowledge of the bullet's caliber to assist in finding a gun of that same caliber:

Q:    After you found the ammunition and the holster, what did you do?
A:    I then retrieved it and notified the officers in the area and asked him was there any more weapons or anything near that this ammunition and this holster goes to.
Q:    What did the defendant say?
A:    He said no.
Q:    Finding a person at 5 in the morning with ammunition and a holster in their pocket, what did you think to do next?
A:    Canvas the area to see if the weapon was possibly thrown. We have that a lot in Opa-Locka.
Q:    Why would you be looking for weapons to have been thrown? Can you explain that?
A:    I was looking for the weapons to be thrown because the round that was in his pocket and the holster led me to believe that there is a weapon that the round goes to and something goes into that holster.
Q:    So ultimately, Officer, what did you continue to do?
A:    Officer Holborow then looked in the west side of the neighbor's yard to see if he had possibly thrown anything over there. I then walked towards the back where I found a—to the back of the listed location where I found a hole in the fence. I then got in my car and drove around the block to the north side of that duplex across the fence where I found two pistols laying near the hole.

51

suggest that Officer Williams seized the bullet to somehow aid him in identifying the "caliber or type of gun" for which he was looking. *Id.* Consequently, the rationale that the ammunition was seizable so it could assist the officer in identifying and then locating a strewn weapon literally bears no relationship to the actual circumstances in Johnson's case.

Because it is divorced from the circumstances of this case, the bullet-means-gun rationale cannot even arguably be viewed as part of any alleged totality-of-the-circumstances rationale for seizing the bullet here. Rather, it supports adoption of a *per se* rule. Instead of evaluating "the concrete factual circumstances that Officer Williams encountered," *id.* at 10, the Opinion "weighs" an abstract fact that, while always true, was never actually considered here, under the guise of a circumstance-dependent test.

But a second problem also plagues the bullet-means-gun argument. By the Majority Opinion's reasoning, every piece of ammunition will always give rise to the deduction that "a gun [is] in the vicinity," and every officer will always have to find any gun to secure the scene and protect himself and others. So if, as the Majority Opinion asserts, a bullet means a gun is present, and knowing the caliber of the bullet is important to "find[ing] any gun to secure the scene and protect [the officer] and

---

Rather, Officer Williams's testimony shows only that he relied on the fact that he found a bullet in general to conclude that a gun in general might be around.

others," in the absence of any limitation on these principles, the presence of a bullet and the corresponding need to know the caliber of it to assist in identifying the gun will always be sufficient, in and of themselves, to support seizure of the ammunition—regardless of any circumstances of the particular *Terry* stop.

Nor is the bullet-means-gun argument the only one the Majority Opinion relies on that suffers from this problem. The Majority Opinion also justifies its determination that the bullet here was seizable on the ground that ammunition threatens the safety of officers and others because it is "an essential part of a lethal weapon," and "grave injury . . . could [] be[] caused by . . . ammunition if . . . loaded into a gun" (the "intrinsic-danger" argument). *Id*. at 10. But what bullet is that *not* true of?

To be sure, the Majority Opinion mentions "Johnson's ammunition" and "in these circumstances" in discussing the intrinsic-danger argument. *See id.* But the specified characteristics of ammunition on which the Majority Opinion actually relies in this argument are not unique to Johnson's single bullet. And even the most thorough of reviews reveals no effort whatsoever by the Majority Opinion to relate these general characteristics of all ammunition to the particular circumstances of Johnson's *Terry* frisk. As a result, the Majority Opinion's camouflage cannot and does not limit the reasoning wearing it.

53

Rather, these intrinsic-danger characteristics of Johnson's ammunition are *always* true of *all* ammunition. So under the intrinsic-danger rationale, in the absence of any express limitation on the principle, all ammunition will always be seizable because, intrinsically, it always "threatens the safety of officers and others." *Id.* at 12. And because ammunition is seizable when it "threatens the safety of officers and others," and all ammunition always threatens "the safety of officers and others" under the intrinsic-danger rationale, all ammunition is always seizable during a permissible *Terry* frisk, without regard to any other considerations.

So all courts in this Circuit are now bound to uphold the seizure of ammunition during a *Terry* frisk—whether the officer seizes the ammunition on a crowded street in the highest-crime neighborhood just before dawn and while the suspect is wearing bulky clothing and is unsecured, or whether the officer seizes the ammunition on a sunny day at an empty beach while the suspect is secured and clad in nothing more than a bikini. And it is pure sophistry to suggest that courts will be able to reach any other conclusions in cases involving ammunition, regardless of any other circumstances. Perhaps that is why the Majority Opinion does not even attempt to explain how any other answer is possible.[5]

---

[5] The Majority Opinion asserts it does not answer this question because "we are not in the business of issuing advisory opinions . . . that merely opine on what the law would be upon a hypothetical state of facts." Majority Op. at 23 (citations and alterations omitted). I agree that we cannot issue advisory opinions. But that's not what this question calls for. Though it is certainly hypothetical that the officers here relied on the caliber of the bullet to help them identify the type of firearm for which they were looking—despite the Majority Opinion's reliance on this

54

Nor is it any answer to this dilemma to simply note, as the Majority Opinion does, that to determine whether an officer may properly seize an item during a *Terry* frisk, we must "consider[] the nature of that object." *Id.* at 20. Of course, that is true.

But significantly, the inquiry we must conduct about the nature of the item under the totality-of-the-circumstances framework is whether the nature of the seized item created a threat to the safety of officers and others *under the particular circumstances the officer encountered*—not whether the nature of the item always poses a threat to the safety of officers and others. The latter is a question we could ask if we were deciding whether to scrap the totality-of-the-circumstances test as applied to ammunition, as the Newsom and Branch Opinions openly advocate doing.

In fact, the Branch Opinion—which expressly concludes that ammunition is always seizable during a proper *Terry* frisk because "a bullet is an instrument for the assault of the police officer," Branch Op. at 34 (citation, internal quotation marks, and alteration omitted)—relies on the very same intrinsic-danger reasoning as the Majority Opinion to reach its conclusion. According to the Branch Opinion's reasoning, "aside from removing [ammunition], no precaution can eliminate the

---

supposition—there is nothing hypothetical about the general proposition that a bullet often means a gun is in the vicinity or that knowing the caliber of ammunition can assist in finding a matching firearm. Nor is there anything hypothetical about the general proposition that ammunition makes guns lethal. And since the Majority Opinion refuses to limit its holding by saying these characteristics about ammunition are not, alone or in combination only with each other, determinative of whether ammunition may be seized, *see infra* at 56, no other facts matter.

55

danger" ammunition poses, since a bullet's "only purpose is to be used with a firearm," and "a bullet located during a *Terry* frisk poses an inherent risk to the safety of the officers and the others nearby." Branch Op. at 35-36. In other words, the Branch Opinion employs the intrinsic-danger rationale to expressly hold what the Majority Opinion implicitly (and necessarily) holds through the very same reasoning.

The Majority Opinion easily could have avoided this problem and could have limited itself to holding only that the seizure of Johnson's ammunition was appropriate under the totality of the circumstances here, if it wanted to do so. All it needed to do is simply state that the bullet-means-gun and intrinsic-danger arguments, alone or in combination with only each other, are not enough, in and of themselves, to warrant seizure of ammunition during a permissible *Terry* frisk. A single sentence would do that trick. That's it.

In fact, I expressly invited the Majority Opinion to do just that. And by this dissent, I renew my call.

Tellingly, though, the Majority Opinion refuses to add any such language. We should ask ourselves why. If the Majority Opinion believes that the bullet-means-gun and intrinsic-danger arguments, alone or in combination with only each other, are not enough to warrant seizure of ammunition during a *Terry* stop, why will it not just say so?

Because the Majority Opinion refuses to limit its reasoning today, under our prior-precedent rule, the Majority Opinion's bullet-means-gun and intrinsic-danger reasoning—which are applicable to all ammunition in all circumstances and not limited to the facts of Johnson's case—bind all courts in the Eleventh Circuit to rule ammunition always seizable during a proper *Terry* frisk.

Even the Branch Opinion implicitly recognizes as much. True, the Branch Opinion states that it "join[s] the Majority Opinion in full." But significantly, that endorsement is qualified with two "clarif[ications]. Branch Opinion at 31. And those "clarif[ications]" preclude the Branch Opinion's analysis from supporting the Majority Opinion's totality-of-the-circumstances alternative holding. In particular, the Branch Opinion necessarily qualifies its endorsement of the Majority Opinion with the following two "clarif[ications]": that "(1) the totality of the circumstances analysis in *Terry* applies ***only*** when the officer is determining whether (a) to stop and (b) then to frisk the detained person; and (2) if the officer conducting the frisk complies with the scope of the search permitted by *Terry* and feels what the officer reasonably believes is a bullet, the officer ***may in all circumstances seize it***." *Id.* (emphasis added). In other words, the Branch Opinion expressly disavows the idea

57

that the totality-of-the-circumstances test governs—or even applies in any way to—the question of whether ammunition may be seized during a permissible *Terry* frisk.[6]

So the Branch Opinion's "clarif[ication]"—that the totality-of-the-circumstances analysis does not govern whether ammunition is seizable during a permissible *Terry* frisk because ammunition is always seizable during a permissible *Terry* frisk, regardless of the circumstances—cannot peacefully coexist with the Majority Opinion's claimed sole holding—that Johnson's ammunition was properly seized under an analysis of the totality of the circumstances existing after the frisk had already been properly embarked upon and at the time Williams recognized a bullet was in Johnson's pocket. Either the totality-of-the-circumstances analysis governs whether ammunition is seizable during a permissible *Terry* frisk, or it doesn't. And if it does, ammunition cannot then always be seizable during a proper *Terry* frisk. Otherwise, employing the totality-of-the-circumstances analysis to ascertain whether seizure of ammunition is allowed during a given permissible *Terry* frisk would be an utter waste of time.

---

[6] *See also id.* at 32 ("The initiation of the stop and the initiation of the pat down are the only two points in the encounter at which the officer's reasonable belief must be assessed based on the totality of the circumstances."); 35 ("If an officer discovers a bullet during a frisk lawful under *Terry*, the officer is entitled to seize the bullet as it is an instrument of assault ***in all circumstances***.") (emphasis added); 36-37 ("[H]aving found a bullet pursuant to a *Terry* frisk, an officer is permitted to seize it in the same manner as he would a gun."), ("[I]t is reasonable ***under all circumstances*** for the officer to protect his safety and that of others nearby by removing the bullet.") (emphasis added); 37 ("[A]nytime an officer conducts a lawful *Terry* frisk, the officer may seize any bullet located during the frisk.").

Rather, if a totality-of-the-circumstances analysis governs, that necessarily means that in at least some circumstances, ammunition will not be seizable. So the Branch Opinion's "clarif[ication]" of the Majority Opinion that ammunition is always seizable during a proper *Terry* frisk is not a "clarif[ication]" at all. Instead, it is necessarily an acknowledgment of the Branch Opinion's understanding that the Majority Opinion renders ammunition always seizable during a proper *Terry* frisk, without regard to the totality-of-the-circumstances test.

What's more, two of the seven judges in the Majority signed the Branch Opinion, which endorses only the ammunition-is-always-seizable theory and necessarily repudiates the applicability of the totality-of-the-circumstances test to determining whether ammunition is seizable during a permissible *Terry* frisk. And since the Majority Opinion has two holdings, including that ammunition is always seizable during a proper *Terry* frisk, the only rationale receiving seven votes today is the Branch Opinion's rationale. It makes no difference that the Branch Opinion states that it "join[s] the majority opinion in full" because the Branch Opinion's "clarif[ication]" of the Majority Opinion necessarily means the Branch Opinion's concurrence in the Majority Opinion is qualified to endorse only the ammunition-is-always-seizable theory.

Plus, even if we could overlook the fact that the Branch Opinion's "clarif[ications]" of the Majority Opinion necessarily qualify its concurrence in the

59

Majority Opinion to supporting only the ammunition-is-always-seizable holding, the Majority Opinion would have two alternative holdings: the narrow one it trumpets—that the bullet here was seizable under the totality of the circumstances—and the broad one it declines to expressly acknowledge—that all ammunition is always seizable in a *Terry* frisk.

And under those circumstances, make no mistake: as a practical matter, the Majority Opinion's stealth holding that ammunition is always seizable in a *Terry* frisk is the only holding that counts, regardless of whether the Majority Opinion openly admits that. Though alternative holdings are equally binding if they receive the support of a majority of judges considering the issue, *see Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008), the ammunition-is-always-seizable holding necessarily will devour the totality-of-the-circumstances holding in every case. So if the two holdings produce different answers to the question of whether ammunition is seizable in a *Terry* frisk in any given case, the holding that the ammunition is always seizable will always demand the overall conclusion that the ammunition is seizable. *See United States v. Leon*, 468 U.S. 897 (1984) (fruit of impermissible search admissible where officers reasonably believed in good faith that the search was valid).

The Majority Opinion has no answer to this problem. Instead, it invokes everyone from Chief Justice John Marshall to Bryan Garner for the truism that

60

judicial decisions are limited to the facts of the case before the court.  *See* Majority Op. at 21-22.  But that does not respond to the problem here.

Indeed, Garner's *The Law of Judicial Precedent*, which the Majority Opinion relies on, *see* Maj. Op. at 21, explains that while a court decides only the case before it, "the rationale that carries the force of precedent is that without which the judgment in the case could not have been given, and not the reasoning articulated by the court," Bryan A. Garner, *et al.*, *The Law of Judicial Precedent*, § 6, at 83 (2016) (citation and internal quotation marks omitted).  In other words, our prior-precedent rule dictates an opinion's holding.

Yet the Majority Opinion fails to account in any way for the prior-precedent rule, which today requires the conclusion that all ammunition is always seizable during a permissible *Terry* frisk.  In fact, the Majority Opinion does not even mention the prior-precedent rule.

So in sum, the bullet-means-gun and intrinsic-danger rationales apply to all ammunition, regardless of any surrounding factual circumstances, and we have declared today that each of these rationales requires the conclusion that ammunition represents a threat to the safety of officers or others.  Since a threat to the safety of officers or others always justifies the seizure of an item during a permissible *Terry* frisk, in the absence of limiting principles, under our prior-precedent rule, the bullet-means-gun and intrinsic-danger rationales necessarily require all courts in this

61

Circuit to now rule valid the seizure of ammunition during a proper *Terry* frisk, without consideration of any surrounding circumstances.

The new rule we adopt may or may not ultimately be the right answer. But we should at least be forthright about what we are holding and about the consequences of today's decision. And we should ask for and consider the parties' positions in the process.

**B.**

A reader may wonder what difference it makes whether we openly announce our holding that ammunition is always seizable if the holding is nonetheless ascertainable from our reasoning today? In my view, a lot.

It matters because we are a United States Court, and forthrightness is our stock in trade. We have a duty to be open and honest with Johnson, officers, members of the public, and federal courts about the practical legal consequences of our decision today.

It matters because officers and members of the public who have not had reason to think about the practical legal consequences of the Majority Opinion's reasoning may be under the misimpression after today that ammunition is not always seizable in a *Terry* frisk. As a result, officers may (now unnecessarily) spend time weighing how dark it is or how much crime has been committed in a given locale before deciding whether to seize ammunition, potentially imperiling their safety if the

62

Majority Opinion's rationale rendering all ammunition seizable is correct.  And it matters to the privacy rights of the public who may (now mistakenly) believe that officers are not entitled to seize ammunition from their pockets in some scenarios.

It matters because now busy courts in this Circuit will have to waste their time going through the motions of applying the totality-of-the-circumstances test to determine whether ammunition is seizable in a *Terry* frisk, only to ultimately have to hold in every single case that it is, regardless of the outcome of the totality-of-the-circumstances analysis.

It matters because if Johnson wishes to seek certiorari on the question of whether ammunition is, in fact, always seizable under *Terry* or whether instead ammunition is seizable only if the totality of the circumstances warrants it, he will have to spend several pages of his petition just proving that the Majority Opinion establishes this rule.

It matters because if members of the public knew we were going to consider announcing a rule that ammunition is always seizable in a *Terry* frisk, some—such as advocacy organizations for civil rights, law-enforcement officers, and gun enthusiasts, as well as criminal-defense-attorney organizations—may have wished to have filed *amicus curiae* briefs to assist us in evaluating the legal advisability of that position.

63

And it matters because if, outside the strictures of our adversarial system, we are going to adopt a new rule no party advocated for, we have a duty to plainly state that that is what we are doing. And then we have a duty to explain why that extraordinary measure is necessary. If we can't, we should not adopt a new rule in this way.

## II.

Perhaps the Majority Opinion does not expressly acknowledge its ammunition-is-always-seizable holding because we never asked the parties to brief the question it answers, neither party argued the ammunition-is-always-seizable position that the Majority Opinion's new rule adopts today, and the government expressly disavowed it during oral argument. In other words, we never subjected today's new rule to the adversarial process.

Had we done so, we could have had more confidence in the Court's new rule. As Justice Gorsuch has explained, "[N]ormally . . . the crucible of adversarial testing is crucial to sound judicial decisionmaking. We rely on it to yield insights (or reveal pitfalls) we cannot muster guided only by our own lights." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1232-33 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (citation and internal quotation marks omitted); *see also Greenlaw v. United States*, 554 U.S. 237, 244 (2008) ("[W]e normally decide only questions presented by the parties. Counsel almost always know a great deal more about their

64

cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us.") (citation and quotation marks omitted); *Maslenjak v. United States*, 137 S. Ct. 1918, 1931-32 (Gorsuch, J., concurring in part and concurring in the judgment) (joined by Thomas, J.).

Not only that, but "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Nelson*, 562 U.S. at 148 n.10 (2011) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (opinion for the court by Scalia, J.)).  And the "doctrine of judicial self-restraint requires us to exercise the utmost care whenever we . . . break new ground . . . ."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

This is especially true when we decide on the scope of a constitutional right. *See, e.g.*, *Nelson*, 562 U.S. at 148 n.10 ("In this case, petitioners did not ask us to hold that there is no constitutional right to informational privacy, and respondents . . . thus understandably refrained from addressing that issue in detail.  It is undesirable for us to decide a matter of this importance in a case in which we do not have the benefit of briefing by the parties . . . .").  And that is the case even more so when we determine the scope of a constitutional right while sitting en banc on rehearing. Indeed, "[a]n en banc . . . rehearing is not favored and ordinarily will not be ordered

65

unless . . . the proceeding involves a question of exceptional importance." Fed. R. App. P. 35(a)(2). When a case "involves a question of exceptional importance," employing the powerful adversarial-testing tool is even more crucial to ensure we reach the best possible answer under the law. But we did not do that here.

We could have. In fact, it was entirely within our control to do so.

We are the ones who decide the question the parties must address for en banc rehearing. So we could have asked the parties to brief whether an officer may always seize ammunition when that officer immediately recognizes it during a *Terry* frisk or whether instead we must always apply *Terry*'s totality-of-the-circumstances analysis to determine whether the seizure of ammunition is reasonable under the specific facts of a particular situation. But we did not ask that question.

Left to their own devices, the parties argued over application of *Terry*'s totality-of-the-circumstances test to the specific facts of this case—that is, whether Officer Williams's seizure of the single bullet was reasonable in light of the particular factual scenario that arose here. When we saw that neither party's briefing advocated for—or even addressed—a rule that would allow officers to always seize ammunition upon immediately recognizing it during a *Terry* frisk, we could have given the parties a supplemental-briefing instruction requiring them to comment on the issue. But we did not do that.

66

We also could have appointed counsel to argue the position that no party chose to take: that an officer may always seize ammunition upon immediately recognizing it during a *Terry* frisk. To be sure, we have embraced the appointed-counsel procedure in the past when no party has adopted a particular side of a given issue. *See*, *e.g.*, *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1079 (11th Cir. 2017) (en banc) (listing court-appointed *amicus curiae*). But we did not appoint counsel here.

And even after oral en banc arguments, when it became clear a majority of this Court decided that it was considering affirming on the basis of today's new rule, it was not too late to solicit the parties' opinions and appoint counsel if necessary. We reserve time in our annual schedule for at least three en banc sessions every year. Sometimes we use them all; sometimes we don't. But they are always available. So we easily could have reset the case for a new en banc rehearing to occur in January—just three months after the first one.[7] Then we could have directed the parties to brief the question the Court decides without their input (or approval) today. If no one took today's Majority's position, we could have appointed counsel to brief it. But we did not do that, either.

---

[7] Or if we thought the issue just couldn't wait three months, we could have done what we did this past summer, when we added an en banc argument that we heard at a time that was not previously on our annual schedule. *See*, *e.g.*, *Ovalles v. United States*, 905 F.3d 1231 (11th Cir. 2018) (en banc) (argued July 9, 2018).

67

Yet now, without the benefit of briefing on this rule by any party before the Court—or even a decision from the district court here mentioning this rule—and over the government's disavowal at oral argument of the rule we adopt, we embrace a brand new rule. And this rule isn't new to just us. This rule is new to federal appellate jurisprudence: in the fifty years since the Supreme Court issued *Terry*, no other Circuit has adopted or expressly rejected this rule.[8] In fact, no other Circuit has even considered the precise question of whether an officer may always seize ammunition when that officer immediately recognizes it during a *Terry* frisk, or whether instead we must always apply *Terry*'s totality-of-the-circumstances analysis to determine whether the seizure of ammunition is reasonable under the specific facts of a particular situation.[9] That makes subjecting the new rule to adversarial testing even more critical.

---

[8] The Majority Opinion cites *United States v. Ward*, 23 F.3d 1303, 1306 (8th Cir. 1994), for the proposition that "an officer may seize ammunition when it threatens the safety of officers and others." *See* Majority. Op. at 12. I agree with this general proposition, but whether ammunition threatens the safety of officers and others has, until now, been assessed in light of the totality of the circumstances. And in *Ward*, the Eighth Circuit upheld the seizure of shotgun shells seized from a suspect's pocket based on the fact that, under the circumstances of that case, they were contraband—not based on the idea that ammunition is always seizable because it is ammunition. *See Ward*, 23 F.3d at 1306 (citing *Minnesota v. Dickerson*, 508 U.S. 366 (1993), for the proposition that "contraband may be seized during a *Terry* stop").

[9] Of the five state jurisdictions the Majority Opinion cites, *see* Majority. Op. at 12-13, only Nevada has issued a holding consistent with the Majority's conclusion today that ammunition is always seizable. In *Scott v. State*, 877 P.2d 503, 509 (Nev. 1994), Nevada's Supreme Court upheld the retrieval of ammunition from the suspect's pocket and noted that "it is reasonable for an officer, as a precautionary measure, to retrieve and separate from a suspect during the course of a *Terry* stop and frisk, either weapons or ammunition or both." In doing so, it offered no analysis of how *Terry* fits into the picture or of anything beyond *Scott*'s single statement quoted above and in the Majority Opinion. Instead, it relied on *Ward*, *State v. Smith*, 665 P.2d 995, 998 (Ariz. 1983) (en

But instead, the Majority has skipped the adversarial testing and on its own created the rule we adopt today. I think adversarial testing is a pretty important part of our judicial process—and we easily could have done it here. My colleagues offer no reason for why it is appropriate to avoid adversarial testing in this case, and I am not aware of one, either. So I cannot join my colleagues in announcing the Court's new rule.

## III.

Instead of asking the parties to address whether ammunition is always seizable in a *Terry* frisk, without regard to the particular circumstances, we asked the parties to brief and argue whether the bullet here was reasonably seized under *Terry*'s totality-of-the-circumstances framework.[10] So the Majority's decision making all

---

banc), *People v. Lewis*, 123 A.D.2d 716 (N.Y. App. Div. 1986), and *State v. Moton*, 733 S.W.2d 449, 451 (Mo. Ct. App. 1986). But the courts in each of those cases upheld the seizure of the ammunition based on the totality of the particular circumstances—not on the fact that what was seized was ammunition. The same is true of the other state-court case the Majority Opinion cites, *People v. Colyar*, 996 N.E.2d 575 (Ill. 2013).

[10] In my view, as argued, this is not an en-banc-worthy issue. While it is certainly a good thing to provide clarity to police officers doing their jobs, the question we asked necessarily turns on the specific facts of the given case. So no answer can give broad instruction to officers trying to ascertain when it is appropriate to seize ammunition in the course of a *Terry* frisk. As a result, as the issue has been argued here, this case does not raise a question of "exceptional importance," Fed. R. App. P. 35(a)(2), as that term of art is understood. *See Bostock v. Clayton Cty. Bd. of Comm'rs*, 894 F.3d 1335, 1336 n.1 (11th Cir. 2018) (Rosenbaum, J., dissenting from the denial of rehearing en banc); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1269 n.12 (Tjoflat, J., concurring in part and dissenting in part) (opining that a hostile-work-environment sexual-harassment case was not en banc-worthy because it "was a rather routine decision that rested on an extremely fact-intensive review"). And based on the Majority Opinion's new rule that all ammunition is always seizable in a *Terry* frisk, regardless of the circumstances—a rule that moots the totality-of-the-circumstances test when it comes to ammunition—the Majority Opinion apparently agrees that the question as framed was not, in and of itself, en-banc worthy.

69

ammunition seizable under all conditions, without regard to the totality-of-the-circumstances test poses a dilemma: I can either (1) substantively analyze and opine on the advisability of a rule that we did not ask the parties to brief, that that they did not argue, and that the government expressly disavowed—and in an en banc case, no less; or (2) analyze how the totality-of-the-circumstances test applies to the ammunition here in light of the particular circumstances adduced through the evidentiary hearings—the (non-en banc worthy) question we did ask the parties to brief and they did argue—even though in this Circuit, as a result of the Majority Opinion's new rule, that test has now become forever moot as it relates to ammunition.

An important consequence arises from choosing which question to answer: the question reviewed limits the universe of answers we can reach.

For example, the first question—whether ammunition is always seizable in a proper *Terry* frisk when the officer identifies ammunition—assumes that it may be possible under *Terry* for all ammunition as a class to be ruled seizable, without regard to any circumstances. As a result, the universe of potential answers to that question includes the conclusion that all ammunition as a class is seizable under *Terry*, without regard to any circumstances.

But that answer is not possible in the universe defined by the second question—whether the totality of the circumstances here made it permissible for

70

Officer Williams to seize the bullet from Johnson's pocket at the time he so identified it. The second question, which requires application of the totality-of-the-circumstances framework, necessarily anticipates that items subject to it will not be seizable under at least some circumstances. Indeed, if a certain type of item subject to the totality-of-the-circumstances test were always seizable based solely on the nature of the item itself, the particular circumstances under which it was seized would never matter, and the test would be meaningless as applied to that type of item. So under the second question—the only one we asked the parties to answer—if a certain type of item (such as ammunition) is subject to the totality-of-the-circumstances test, it must not be seizable in at least some circumstances.

The Majority's answer in this case—which creates the rule that ammunition is always seizable, regardless of the circumstances—does not fall within the universe of possible answers we ourselves created for this en banc proceeding when we asked the parties to brief the totality-of-the-circumstances question. That brings me back to my dilemma: I can substantively analyze a question that was never at issue in these en banc proceedings, or I can apply a now-meaningless test (as it relates to ammunition) that is not capable of coming to the Majority Opinion's ultimate answer—that ammunition is always seizable.

For the reasons I have explained in Section II, I am uncomfortable with the first course of action. I therefore respectfully decline to participate in it.

71

As for the second, since the Majority Opinion effectively banishes the totality-of-the-circumstances test (when it comes to ammunition) to the Eleventh Circuit's attic, applying that now-defunct test to the particular circumstances surrounding the seizure of the single bullet here is an exercise that can serve no practical purpose. It cannot determine the outcome of this case, and it cannot even arguably make points that future courts considering motions to suppress ammunition seized in *Terry* frisks might find helpful, since the test no longer matters as it pertains to ammunition.

The Majority Opinion criticizes this dissent for "refus[ing] to answer the one question [posed to the parties] that a majority of this Court voted to decide en banc."[11] Maj. Op. at 21. But notably, the question we asked the parties to brief and they in fact briefed sought resolution of the case by applying the totality-of-the-circumstances test to the specific facts here. Though the Majority Opinion claims to "answer the very question the parties briefed and argued," *id.*, as I have explained, *see supra* at Section I, the Majority Opinion's alternative ammunition-is-always-seizable holding—the only one that matters since it extinguishes the vitality of the

---

[11] The Majority Opinion further seems to imply that I do not answer because I "deem[] [the question of whether the bullet was properly seized under the totality-of-the-circumstances framework] non-en-banc worthy." *Id.* at 21. Not so. True, I do fully believe that the issue we asked the parties to brief and argue is not en-banc worthy by the standard Rule 35(a)(2) imposes— and even more so as Circuit Courts have construed this standard. *See supra* at 69 n.10. But that has nothing to do with why I do not apply the totality-of-the-circumstances test today. Rather, as I have explained, I respectfully decline to apply the totality-of-the-circumstances test because in this Circuit, it is now a relic as applied to ammunition, so nothing I write on that test's application to these facts can possibly be useful.

72

totality-of-the-circumstances test as applied to ammunition in this Circuit—applies the totality-of-the-circumstances test no more than this dissent does.

Charades may be fun at parties, but not in judicial opinions where officer safety and privacy rights hang in the balance. I therefore respectfully decline to engage in that activity.[12]

## IV.

Today we issue a new rule we did not ask the parties to brief, they did not brief, and the government expressly disavowed. And we do this even though we could have obtained the parties' input on the question we decide today. I respectfully decline to participate in that activity. The parties' testing of the issues we decide is and should be the engine that drives our adversarial system.

---

[12] I understand and respect my colleagues' Dissents, which have chosen to apply or otherwise comment on the test we asked the parties to brief, even though the Majority Opinion today moots it. Judges Jill Pryor and Jordan were on the original panel that understandably applied the totality-of-the-circumstances test, and it makes sense why they would want to explain the reasons supporting that panel's decision. I, however, was not a part of that panel and have not previously applied the totality-of-the-circumstances test to the particular facts of the case before us. And I see little reason under the circumstances to apply that test to the single bullet here for the first time now that the test effectively has no meaning in this Circuit when it comes to ammunition.

73

JILL PRYOR, Circuit Judge, joined by WILSON, MARTIN, and JORDAN, Circuit Judges, dissenting.

A beat cop's job isn't easy, and it comes with substantial personal risk. Our law must provide police officers with sufficient discretion, and room for mistakes, that they can keep themselves safe. But officer safety is not the only interest at play here. The people whom officers police and protect have a Fourth Amendment right to be free from unreasonable searches and seizures. This case stands at the crossroads of these two very compelling interests. It's a crossroads where courts often find themselves. For more than half a century, the Supreme Court, faced with resolving the tension between these two interests, has adhered to the principle that after conducting an investigatory stop of a person "a law enforcement officer, for his own protection and safety, may conduct a patdown to find *weapons* that he reasonably believes or suspects are then in the possession of the person he has accosted." *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (emphasis added) (explaining the rule announced in *Terry v. Ohio*, 392 U.S. 1 (1968)).[1] It has equally held fast

---

[1] The only other item besides weapons that the Fourth Amendment permits a police officer to seize during a *Terry* stop and frisk is "contraband" detected by plain feel, if the officer is acting within the bounds of *Terry* at the moment the officer develops probable cause to believe contraband is present. *Minnesota v. Dickerson*, 508 U.S. 366, 374-76 (1993). Neither the government nor the majority believes that the freestanding bullet was contraband in this case, and I agree.

Mr. Johnson previously had been convicted of a felony, so he could not lawfully possess a gun or ammunition. But his prior felony conviction did not justify seizure of a single bullet found in Mr. Johnson's pocket as contraband because at the time the officers seized the bullet, the officers had no information that Mr. Johnson was a convicted felon. They therefore had no probable cause to believe that a single bullet would be contraband in Mr. Johnson's possession.

to the corresponding principle that the permissible scope of a *Terry* frisk is "narrow," and "[n]othing in *Terry* can be understood to allow . . . any search whatever for anything but weapons." *Id.* at 93-94 (internal quotation marks omitted); *see United States v. Valerio*, 718 F.3d 1321, 1324 (11th Cir. 2013) (characterizing *Terry* as a "narrow exception to the probable cause requirement" that typically applies when an individual's Fourth Amendment rights are implicated).

In this case, police officers lawfully stopped Paul Johnson, Jr., placed him on the ground, handcuffed him, and held him at gunpoint while one officer frisked him. During the frisk, Officer Dwight Williams felt a single bullet and a nylon holster in Mr. Johnson's front pants pocket and then reached into the pocket to seize these items. The seizure of the bullet and holster was unlawful under *Terry*. In holding otherwise, the majority has unjustifiably broadened the scope of *Terry*'s narrow exception, tipping the balance too far in favor of law enforcement's desire to collect evidence and against the Fourth Amendment rights of the people they police. I respectfully dissent.

---

*See id.* at 375-76; *United States v. Blom*, 242 F.3d 799, 808 (8th Cir. 2001) ("reject[ing] [any] suggestion that a police officer with no knowledge of a citizen's criminal history may constitutionally seize firearms or ammunition without a warrant, so long as the citizen turns out to be, in hindsight, a convicted felon").

My dissent proceeds in three parts.  First, I explain why, under the totality of the circumstances in this case, the officers were not permitted to seize the bullet and holster from Mr. Johnson's pocket.  Second, I explain why the majority's decision effectively—and wrongly, I say—creates a categorical rule that a freestanding bullet may be seized under *Terry*.  Third, I explain my view that the majority opinion permits *Terry* frisks to be used for evidence gathering— something the Supreme Court expressly has forbidden.

## I.    The Totality of the Circumstances Requires Suppression of the Bullet and Holster.

The Fourth Amendment protects people "against *unreasonable* searches and seizures."  U.S. Const. amend. IV (emphasis added).  Interpreting that foundational principle, the Supreme Court has affirmed that "[t]he reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations."  *Grady v. North Carolina*, 135 S. Ct. 1368, 1371 (2015).  In the context of a stop and frisk, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21.

A *Terry* frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the

76

assault of [a] police officer" or "others nearby." *Id.* at 29.  That is because

safety—of officers on the scene and the public at large—is the bedrock of *Terry*,

the only valid purpose for a *Terry* frisk.  *Id.*  To determine whether a frisk was

reasonable in its scope, we consider the totality of the circumstances.  *United*

*States v. Cortez*, 449 U.S. 411, 417 (1981).

Here are the circumstances of the frisk of Mr. Johnson.  In the early morning

hours in Opa-Locka, Florida—a high-crime area—the local police department

received a 911 call about a possible burglary in progress at a four-unit home.  The

911 caller reported that a "person [was] trying to get through the window of [a]

neighbor's house," and the dispatcher relayed to the police that the suspect was a

black male wearing a white shirt.  Doc. 22 at 6, 19.[2]  Two officers, both of whom

received the description of the person in question, arrived on the scene.  There,

they saw Mr. Johnson, a black male in a white shirt, coming from the back of the

building where the reported incident had taken place.  The officers drew their

weapons, pointed them at Mr. Johnson, and ordered him to approach with his

hands up.  Mr. Johnson immediately complied.  At this point, a third officer

arrived.  Officer Williams, who was one of the first two officers on the scene, told

Mr. Johnson that he was being detained until the officers could "figure things out."

*Id.* at 33.  Another officer ordered Mr. Johnson to the ground near the parking area

---

[2] Doc. # refers to the numbered entry on the district court's docket.

at the front of the building, Mr. Johnson immediately complied, and then Officer Williams handcuffed him while the other officers trained their weapons on him. Officer Williams then frisked Mr. Johnson.  To recap:  during the frisk, Mr. Johnson was handcuffed, lying on the ground, and surrounded by three armed officers.

Officer Williams felt in Mr. Johnson's front pants pocket "a nylon piece of material; and then, underneath it, a round, hard-like, oval-shaped object, which led [him] to believe it was ammunition."  Doc. 30 at 6.  He reached into Mr. Johnson's pocket and removed a black nylon pistol holster and a single round of .380 caliber ammunition.  When asked whether there were any "weapons or anything near that this ammunition and this holster goes to," Mr. Johnson said no.  Doc. 22 at 10. The officers began sweeping the area for weapons that might have been thrown. At that point a fourth officer arrived and saw Mr. Johnson handcuffed on the ground, the bullet and holster lying next to him, and another officer standing over Mr. Johnson with his gun drawn.  Officer Williams walked toward the back of the building, found a hole in the fence separating that property and the property behind it, and then found two firearms lying near the hole on the other side of the fence.

Viewed in their totality, the circumstances of this case require suppression of the bullet[3] because no officer reasonably could have believed that a single bullet—without any accompanying indication or reasonable expectation of the presence of a firearm Mr. Johnson could access—posed a present safety threat.[4]  I view as critical the combination of facts that before Officer Williams felt the bullet in Mr. Johnson's pocket, (1) there had been no report or indication of a weapon or an accomplice at the scene;[5] (2) at least two other armed officers had arrived at the scene; (3) Mr. Johnson had immediately, peacefully, and *at gunpoint* complied with the officers' commands; and (4) the officers had placed Mr. Johnson on the

---

[3] Given the evidence in this case—including testimony that Officer Williams realized during the frisk that Mr. Johnson had a bullet in his pocket and that Opa-Locka officers always canvass the area where a person suspected of possessing weapons is detained—it seems to me that the firearms inevitably would have been discovered by law enforcement, thereby dooming Mr. Johnson's request for suppression. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."); *United States v. Lemons*, 153 F. Supp. 2d 948, 965-67 (E.D. Wisc. 2001) (applying the inevitable discovery doctrine to deny suppression of a firearm found after an unconstitutional seizure of bullets under circumstances similar to those in this case).  But the government did not press this theory in the district court, choosing instead to argue only that Officer Williams's seizure of the bullet and holster from Mr. Johnson's pocket (before any firearms were discovered) was within the scope of Officer Williams's *Terry* frisk.  So we must decide this case based on whether the seizure of the bullet and holster came within the permissible scope of a *Terry* frisk.

[4] Neither the officers nor the majority attempts to justify the removal of the nylon holster, an item Officer Williams never suspected was a weapon or contraband.  *See* Jordan Dissenting Op. at 42 n.4.

[5] True, the officers testified that in their experience armed burglaries in the area often were committed by more than one person.  They did not, however, testify that most of the burglaries they encountered were armed—just that some were.  At any rate, the officers' general experience was belied by the facts confronting them:  a 911 call reporting one individual with no mention of a weapon and, at the scene, a single individual who appeared—and was confirmed—to be unarmed.

79

ground and handcuffed him. *See, e.g.*, *United States v. Miles*, 247 F.3d 1009, 1011, 1015 (9th Cir. 2001) (reversing the district court and ordering suppression of a box of ammunition removed from a defendant's pocket during a *Terry* frisk, reasoning: "Having already used significant force to secure the scene for safety purposes [including handcuffing the suspect and having him kneel down], the officers cannot leverage the safety rationale into a justification for a full-scale search [of the suspect's pocket]."); *United States v. Reid*, 351 F. Supp. 714, 718 (E.D.N.Y. 1972) ("With the weaponry in the hands of the agents trained on the suspects, a slapjack could hardly have been a threat to the arresting agents.").

The majority opinion relies on other circumstances, including the time of day and accompanying darkness and the location of the incident in a high-crime area. Maj. Op. at 10; *see* Newsom Concurring Op. at 25. Those facts, which the officers knew at the moment they initiated the stop, undoubtedly are "relevant contextual considerations" for the officers' decisions to stop, frisk, and seize a bullet from Mr. Johnson. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). The same is true of the fact that Mr. Johnson matched the vague description given by the 911 caller. But by the time Officer Williams reached his hand into Mr. Johnson's pocket, he had much more specific information than he did when the officers initiated the stop and frisk. Officer Williams found no firearm or other weapon on Mr. Johnson's person. And, critically, Mr. Johnson was completely

80

restrained and fully compliant, and the officers had neither obtained any information about nor observed any other person on the scene, much less a suspected accomplice.  So at the time of the bullet's seizure, the general contextual considerations upon which the majority opinion relies provided little if any support for a "rational inference[]" that a single bullet in Mr. Johnson's pocket would pose a danger.  *See Terry*, 392 U.S. at 21, 27.

For the bullet to amount to a threat, Mr. Johnson, lying on the ground with his hands handcuffed behind his back, would have had to escape his handcuffs like Houdini, retrieve the bullet from the front pocket of his pants, escape from custody with guns trained on him, and find a matching gun to use the bullet.  Or, under the majority opinion's accomplice theory, Maj. Op. at 17, under the same conditions Mr. Johnson would have had to escape the handcuffs, retrieve the bullet, and then throw the single bullet—in the dark—to an accomplice waiting with a matching unloaded gun or receive a gun from a hidden and unreported accomplice and load the gun with the single bullet.  None of these scenarios is plausible, much less reasonable.  Neither supports a "rational inference[]" that the single bullet had to be seized for safety purposes.[6]  *See Terry*, 392 U.S. at 21, 27.

---

[6] Although it is immaterial to our reasonable suspicion analysis—an objective inquiry—the officers in this case worried so little about the bullet after seizing it that they left it on the ground near Mr. Johnson.  If a bullet, in and of itself, creates a safety concern, leaving it on the ground near a handcuffed suspect makes the situation no safer than leaving the bullet in his pocket.

81

The majority opinion cites cases from other jurisdictions for the proposition that *Terry* authorizes officers to seize ammunition during a frisk. *See* Maj. Op. at 12-13. But in all of these cases, unlike here, the facts established or at least strongly suggested the immediate presence or possession of a firearm. In most, the officers directly observed a gun before or during the frisk. *See, e.g.*, *United States v. Ward*, 23 F.3d 1303, 1304-06 (8th Cir. 1994) (frisk by a single officer of a "jumpy" and "nervous" suspect uncovered both a sawed-off shotgun and shotgun shells); *State v. Smith*, 665 P.2d 995, 996-98 (Ariz. 1983) (officers observed that the suspect, who matched the description of a person seen threatening people with a sawed-off shotgun, had such a shotgun in his car); *Scott v. State*, 877 P.2d 503, 505 (Nev. 1994) (frisk took place after a firearm was observed in the suspect's car); *see also State v. Moton*, 733 S.W.2d 449, 450-51 (Mo. Ct. App. 1986) (single police officer responding to a domestic violence call performed frisk after hearing suspect threaten to commit murder and seeing him toss aside a metallic object). These cases might provide glancing support for the majority opinion's holding, but they are too different on the relevant facts to be persuasive in Mr. Johnson's case.

Perhaps realizing that these cases do not convincingly support its decision, the majority says that it is "aware of no precedential opinion to the contrary in any jurisdiction." Maj. Op. at 13. In fact, though, there are at least a couple of federal cases that cut against the majority's holding. *See Miles*, 247 F.3d at 1014-15

82

(ordering suppression of a box of ammunition found in a suspect's jacket pocket during a *Terry* frisk, even though the suspect met the description of a person who had fired a gun, because "[w]hile the officer may have been patting down for a weapon, he had reached the outer limits of his patdown authority when it was clear that the object was a small box and could not possibly be a weapon. . . .  At that point, the officer's further manipulation of the box was impermissible."); *United States v. Lemons*, 153 F. Supp. 2d 948, 951, 959-62 (E.D. Wisc. 2001) (ordering suppression of 12 rounds of ammunition found in a sock in a suspect's pocket during a *Terry* frisk, even though a witness had said the suspect was in possession of a gun, because:  "Sterling immediately knew upon patting Lemons down that the items in Lemons's pocket were not a weapon [and] did not immediately identify them as bullets until he squeezed[;] [thus] he went beyond the scope of a *Terry* pat-down search.").  Although these cases differ from this one in that the officers suspected but were not positive that the items felt in the frisk were ammunition, the courts readily concluded that the items were not weapons and could not be further manipulated or seized as such.  I find them compelling, particularly given *Miles*'s similarities to this case—the late hour, a high-crime area, a report of a crime, and a handcuffed suspect—and its differences, too—fewer officers present, officers outnumbered by nearby observers, the report of a violent crime and a firearm at the scene, and the firearm ultimately found six feet from

83

where the officers first spotted Mr. Miles. *Miles*, 247 F.3d at 1010-13. There, as should be the case here, the Ninth Circuit determined that "[h]aving already used significant force to secure the scene for safety purposes, the officers cannot leverage the safety rationale into a justification for a full-scale search." *Id.* at 1015.[7]

## II. A Bullet Is Neither a Weapon Nor a Hidden Instrument for the Assault of an Officer, so Officers Cannot Categorically Seize One.

To repeat, because it's critically important, *Terry* is intended to be a "narrow exception" to the requirement that an officer have probable cause to search a person or seize his property. *Valerio*, 718 F.3d at 1324. In concluding that Officer Williams was entitled to seize a single bullet from Mr. Johnson's pocket under the circumstances of this case, the majority opinion effectively creates a categorical rule permitting officers to seize a freestanding bullet even absent reasonable cause to believe officer or bystander safety is at risk.[8]

---

[7] Though the majority opinion correctly notes that handcuffs are not always secure, Maj. Op. at 17, it's a bridge too far to say that it's reasonable for officers to assume in every case that a handcuffed suspect is unsecured. And, in any event, plenty of additional facts in this case indicated the officers' safety and the scene's security: three officers were present, their weapons were drawn and trained on Mr. Johnson, Mr. Johnson was completely compliant throughout the encounter, the officers perceived no other individuals in the area, and no firearm was ever reported or observed before or during the frisk. When the guns ultimately were found, they were found beyond Mr. Johnson's reach. If *Miles* was a difficult case, this is an easier one.

[8] To be clear, a decision that hewed closely to *Terry* would not prevent officers from seizing bullets or prosecutors from initiating prosecutions such as the one initiated here under 18 U.S.C. § 922(g). They could do both provided they had probable cause for the seizure. *See* 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.6(c) (5th ed. Oct. 2018 update) ("Assuming the object discovered in the pat-down does not feel like a weapon,

84

The majority opinion reasons that a bullet may be seized during a *Terry* frisk because it is an "essential part of a lethal weapon" and "an integral part of what makes a gun lethal."  Maj. Op. at 10, 11.  But *Terry* was careful to carve out an exception for *weapons*, not parts of weapons—no matter how integral to the weapon those parts might be.  392 U.S. at 24 ("[I]t would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a *weapon* and to neutralize the threat of physical harm." (emphasis added)); *id.* at 27 ("[T]here must be a narrowly drawn authority to permit a reasonable search for *weapons* for the protection of the police officer." (emphasis added)).  And a freestanding bullet is neither a weapon nor lethal.  As Judge Rosenbaum points out in her dissent, if a bullet always suggests a gun, then it is difficult to see when a bullet would be off limits to seizure.  Rosenbaum Dissenting Op. at 52-53.  Further, the proposition that regardless of the surrounding circumstances a bullet necessarily suggests a gun, Maj. Op. at 11, such that seizure of a bullet is warranted, contradicts *Terry*'s mandate that an officer have "specific and articulable" facts rendering reasonable his belief that the bullet could get into a gun to threaten the safety of police officers

---

this only means that a further search may not be justified under a *Terry* analysis.  There remains the possibility that the feel of the object, together with other suspicious circumstances, will amount to probable cause that the object is contraband or some other item subject to seizure, in which case there may be a further search based upon that probable cause.").

85

or others. *Terry*, 392 U.S. at 21. The majority opinion has no satisfactory explanation for why it was reasonable for the officers here to believe they were in danger when Mr. Johnson was handcuffed on the ground with multiple officers pointing their weapons at him and no firearm was found on Mr. Johnson or within "those areas to which [Mr. Johnson] would generally have immediate control." *Michigan v. Long*, 463 U.S. 1032, 1050-51 (1983).

Judge Branch in her concurrence expressly advocates for a categorical rule that officers are entitled to seize a freestanding bullet in the name of officer safety. She argues that just as we consider a gun without a bullet to be a weapon under *Terry*, we should consider a bullet without a gun "an instrument of assault in all circumstances." Branch Concurrence at 35. I am not persuaded. First, *Terry* expressly allows the seizure of guns, but we're having this discussion because it does not expressly allow seizure of a freestanding bullet. *Terry*, 392 U.S. at 29. Second, an officer who feels a bullet in a suspect's pocket can discern different facts than an officer who feels a gun. The former can readily observe that the bullet is not loaded into a gun, but the latter cannot readily observe that the gun has not been loaded with one or more bullets. *Terry*'s requirement that a seizure be based on specific and articulable facts takes into account that some circumstances may counsel *against* seizure. Thoroughly frisking a person and finding what feels like a freestanding bullet but no gun may be one of those circumstances. And

86

third, from the standpoint of safety—the *sine qua non* of *Terry*—it makes sense that we don't require officers to rely on the possibility that a gun in a person's pocket is not loaded.  Although Judge Branch is entirely correct that a bullet has no use except as part of an instrument of assault, it doesn't follow that a freestanding bullet is "an instrument of assault in all circumstances."  Such a bright line rule runs afoul of the particularized analysis *Terry* requires and of the principles animating *Terry*'s narrow exception.  *See Grady*, 135 S. Ct. at 1371 ("The reasonableness of a search depends on the totality of the circumstances . . . ."); *Cortez*, 449 U.S. at 417 ("[T]he totality of the circumstances—the whole picture— must be taken into account.").

### III.    The Majority Opinion Permits *Terry* Frisks to Be Used to Gather Evidence, Contrary to the Supreme Court's Clear Directive.

Make no mistake:  the majority opinion's conclusion that a single freestanding bullet could be used as a weapon is a significant extension of *Terry*, one unwarranted under *Terry*'s safety rationale.  That is not all.  The Supreme Court has "condemned" evidentiary searches conducted under the guise of *Terry*, *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993), and yet that is exactly what the majority opinion countenances today.  Instead of considering the bullet to be a safety threat, Officer Williams left it on the ground near Mr. Johnson.  He testified that he used the seizure of the bullet to search the area for a gun that the bullet "goes to," Doc. 22 at 10; in other words, he used the frisk to initiate the precise sort

87

of search that *Terry* forbids.  Rather than running from this fact, the majority relies on it—explaining that removing and examining the bullet in Mr. Johnson's pocket might have expedited the officers' search for a .380 caliber gun in the vicinity. Maj. Op. at 11.  The Supreme Court "has been sensitive to the danger that officers will enlarge a specific authorization . . . into the equivalent of a general warrant to rummage and seize at will."  *Dickerson*, 508 U.S. at 378 (alteration adopted) (internal quotation marks omitted).  Unfortunately, the majority opinion is not sensitive to that danger today.

*   *   *

The panel correctly held that the seizure of a bullet and holster from the pocket of Mr. Johnson—who was compliant with officers' commands, on the ground, handcuffed behind his back, and held at gunpoint by several officers— constituted an unreasonable seizure under *Terry* and its progeny.  *See United States v. Johnson*, 885 F.3d 1313, 1323-24 (11th Cir. 2018).  With respect, I dissent from the majority opinion's contrary holding.

88